JOHN W. PEASE *vs.* EDWARD T. BURROWES.

Cumberland.   Opinion December 23, 1893.

*Witness.   Cross-Examination.   Unsound mind.*

The cross-examination of a witness that shows mental illusion or unbalance
concerning the subject matter of the examination in chief is competent for
the consideration of the jury in weighing the testimony in chief.

The correct account by a witness of knowledge previously obtained depends
upon the capacity of the witness to correctly retain and communicate it.

If, at the time of testifying, the witness' mind shows normal, the testimony
must have greater weight, than if it appears abnormal; for, in the one case,
the medium of communication is trustworthy, while, in the other, it is to be
distrusted according to the degree of unbalance that is made apparent.   Such
cross-examination must necessarily be admitted in the discretion of the
court, *de bene.*

If, when heard, it appears competent for consideration by the jury as bearing
upon the credit of the witness it becomes a part of the testimony in the case
to be weighed and considered.

If it appears to be incompetent for that purpose, and is harmless, its admission
will not be considered error, but, if mischievous, will be cause for a new
trial.

While such cross-examination of the witness is competent for the considera-
tion of the jury in weighing the testimony of the witness, it is not evidence
of the facts so stated, and the jury will be so instructed.

ON EXCEPTIONS.

This was an action for a libel upon the plaintiff, in which the
jury rendered a verdict for the defendant.   The plaintiff took
exceptions to the testimony elicited from his wife, upon her
cross-examination, as appears in the opinion.

*Edward M. Rand and Seth L. Larrabee,* for plaintiff.

Objection to this line of testimony, rests upon the following grounds, viz: That all these interviews and conversations were subsequent to any act of the defendant, alleged or proved by plaintiff, as a part of this case. That all these interviews were with third persons, and in the presence of neither plaintiff nor defendant, and simply *res inter alios.* That any statements of Mrs. Pease, in these interviews were inadmissible, even for the purpose of contradicting her, which was not attempted. That the evidence of the statements of these persons, at these interviews, was merely hearsay, of the most dangerous description. The effect of the admission of the testimony in regard to these subsequent interviews necessarily resulted in causing the true merits of the controversy to be obscured, the attention of the jury to be wearied and distracted, and in leading them astray by a mass of improper testimony upon points not in issue. That the admission of the evidence objected to must have been prejudicial to the plaintiff, seems quite evident from an examination of the statements made by the several unknown parties, viz: "I wrote those anonymous letters. Mr. Burrowes had nothing to do with them, and I am here to tell you rather than to see an innocent man suffer. I wrote those letters. She told me that Mr. Burrowes didn't write those letters. She said that John had those letters written, that her brother wrote them for him."

*Symonds, Snow and Cook,* for defendant.

SITTING: PETERS, C. J., EMERY, FOSTER, HASKELL, WHITEHOUSE, JJ.

HASKELL, J. This is an action for libel in the writing and publication of two anonymous letters of and concerning the plaintiff, without date. They are both addressed to the plaintiff's wife. They are of the following tenor.

" Mrs. Pease : This cut shows how Pease spends his nights in refreshments when away from home. You will be after something like this in a few days."

" Mrs. Pease : Your husband spends his nights with dammed old hoas when away, let this bring you sweet dreams. Why wont You watch him one night will convince You of my truth-fulness.   Bad disease is flying through the air."

Mrs. Pease, called by the plaintiff, testified in chief and with detail of circumstance, that she was forty years of age ; that she received the first letter May 14, 1891, by mail ; that she received the second letter about May 21, in the night, or late in the evening ; that it was thrown by a man from a wagon, upon the steps of her house, while she was sitting at a window that com-manded a view of the steps ; that the night was light, that she had no light in the house, and that the man who threw it, as near as she could tell, was the defendant ; "the man over there, right behind his counsel ;" that the letter was wound around a penstock.

She testified that the first letter contained a drawing of a man and a woman in the act of sexual intercourse, and also newspaper clippings, advertising medicines for "private diseases ;" that she destroyed the drawing and the advertisements, and gave the letter to her husband on his return home, after an absence of two or three days ; that she went out and got the second letter, read it, re-wrapped it around the penstock, and gave it to her husband when he returned home ; that she saw, on the 21st of May, 1891, in the night, the man who threw the letter on the steps ; that her husband was away.

She testified that she next saw him, ( the bearer of the letter,) on the 15th of July, 1892, and said, "I heard the door bell ring. I got up and came down stairs and went to my window.  I never go to the door when I am alone and open it.  I said 'What is it,' and the answer came, 'A message for Mrs. Pease.' I said, 'A telegram ?'  He said, 'A message for Mrs. Pease.' I said, 'Will you please deliver it at the window.'  He made the remark, will I step to the door, and I said, 'Please deliver it at the window."  He came to the window and said,—I am telling this as near as I recollect it,—'Are you alone ?' I remarked, 'No, sir, I am not.'  He said, 'Your little girl is with you, I know, but I wish to speak to you in private.'  I said, 'Anything

you may say to me will be strictly confidential.' I partially recognized him. He said, 'I wish to talk with you, Mrs. Pease, in regard to the anonymous letters that Mr. Burrowes was accused of writing in the unpleasantness, in the spring, with the post office department; would you be willing to talk with me about it?' I said, 'Go on, I am listening.' He said, 'Although Mr. Burrowes did not write those letters, everything points to him, and he will have to answer for it in all probability. Do you know whether your husband is going to push this case, or not?' That was the way he expressed it. I said, 'I think it probable he may.' I said at this point, 'Is this Mr. Burrowes,' for I recognized him then by his peculiar way of twisting his moustache, and holding his hand up, and also by his voice, and everything; I recognized him as Mr. Burrowes. He said, 'I wouldn't care to call names, as it may be unpleasant hereafter.' And after that I addressed him as Mr. Burrowes, and he said nothing against my doing so. He spoke of a thoughtless act. He said he thought it was wrong and unjust that a man should suffer all his life for one thoughtless act, and he spoke of the shame and degradation brought on his family, and a life time of pain. I said, 'Mr. Burrowes, you should have thought of this beforehand, you should never have got yourself into this place.' He spoke of my being a member of the same church he was, that is, a member of the Methodist Church, believing in the same creed that he did, and he spoke of his fine position in the community. He spoke of his wife and children. I said, 'Mr. Burrowes, I am human, I have some feeling as well as you and your wife. I have suffered as much as you ever will.' He spoke of a passage in the bible expressly, and said that brother should not go to law against brother, and I remember he said this passage over to me; 'Love your enemies, do good to them that hate you, and pray for them that persecute you.' I said 'Mr. Burrowes, are you truly penitent? If you are, I have always said that when you came to me and said you were sorry instead of going into your closet and asking forgiveness, as I was the one that was injured, I would meet you half way, and I would forgive you every time, and if it was in my power to

get these letters and give them to you, you should have them.'
At this point I was crying. He said he was sorry, and I said,
'Then Mr. Burrowes, I forgive you, and I will do everything I
can to procure these letters. I have influence over my husband,
and I think I can make him stop this suit against you. If I
can procure these letters you shall have every one of them; and
whether I can or not, I will never injure you, or your family, in
any way or shape,—under these conditions you are never to go
out into the community again and tell everybody that my
husband wrote those letters to me, to get rid of me.' I said
that, 'I wouldn't ask you to go before the public and say you
were guilty; you shouldn't say anything about it. I would
never say anything about it, and would never accuse you of it,
even as I expect you never to accuse my husband again.' And
the agreement was made then and there, between us that he
was forgiven under those conditions. He gave me to under-
stand he did it, and he was truly sorry for writing all those
letters. Then we talked about whether I had influence enough
over my husband to obtain those letters. We talked on that
quite a while, I couldn't tell how long, but some little time.
Then he turned deliberately around, and said to me, 'I have
committed no sin, really no sin; the contents of these letters
are true; the crime is only in my sending the letters, or writing
it to you.' I said, 'Mr. Burrowes, our agreement is broken
from this minute, you have broken yours,' and I shut the
window. I went up stairs. Of course we said other things
that I don't remember. I did not see him again that night.
He rang the bell two or three times, but I didn't go to the door."

She testified that five days afterwards, July 20, 1892, in the
afternoon, she received by mail another letter, of the following
tenor:

"Mrs. Pease was justly wrathful, and shut me out with anger
and scorn, ere any negotiations were reached. Will Mrs. Pease
turn to Matt. 18-21, 22, also Luke, 6-37, also II corinthians,
2-7, also Ephesians, 4-32, and over all others read romans,
12-14, although contrary to my remarks to you. The contents
of all letters were false. Let God judge rather than man, why

they ever reached you.  Now, do not withdraw your sympathy, but have regard for a fellow being in distress.  My faith is sound and strong that this letter will never be exhibited by one I trust, although wronged.  If you will allow me a private audience, will you stand on the Post Office steps, at 6 o'clock, P. M., the 20, (to-day,) read I Corinthians, 4 to 8, and then give me a hearing.  This must not be spoken of, as I warn you that you do not know what torture is or what power I possess. Should anything happen to your children then indeed would your heart be wrung, but all will be well if you will follow your heart, which will tell you what is best.  A friend."

The case was tried upon the general issue, and the evidence is voluminous as to the defendant's connection with the writing and publication of the letters.  He denied both.  The verdict was for the defendant, and the case comes up on exceptions to the admission, upon the cross-examination of Mrs. Pease, of the following testimony :

"On the night of July 27, 1892, at five minutes of eleven, I heard my doorbell ring.  I had been told not to go down to the door anyway, but I hadn't heard from my boys that day and I was afraid that something had happened to them ; they were in the country.  I went down thinking I might have a telegram. I opened the window, as I did for Mr. Burrowes, and I asked the same question 'What is it?'  A gentleman stepped around to the end of the steps, the same as Mr. Burrowes did, close to the window, and said, 'Make no outcry, Mrs. Pease, if you do I shall not stir from these steps.  Have me arrested if you choose but it will go hard with your husband.  I wrote those anonymous letters.  Mr. Burrowes had nothing to do with them and I am here to tell you rather than see an innocent man suffer.  I was hired to do so by your husband in order to get rid of you.  He has had some one here in the city that he loved better than you for a long while — some one on Lincoln street — and the letters were written in the hope that you would get a divorce and make no fuss about it.  That will be my advice for you to do.  So far as experts are concerned they are no authority and I will state my reasons to you.  Mr. Burrowes has some of your letters.'  I

said, 'Yes, I know he has; our letters that we put in the post office department are lost and we have every reason to believe that he has them and I am glad you informed me of that fact.' He has had these letters and some of your husband's writing examined by experts in New York and they have each and all pronounced them the same writing, whereas they are not. I wrote those letters, so you can see how much dependence can be placed in an expert.' Then after he had repeatedly assured me that he wrote them and that Mr. Burrowes had nothing to do with them—O, in the course of the conversation he asked me to give the letters up to him if I had them in my possession, that he would be willing to do most anything for the sake of my giving them up. I said, 'If you wrote those letters for my husband I fail to see why you should come here and make me an offer for them as my husband has every one of those letters in his possession. I can't understand it.' I can't seem to remember what he did say, now.

"The next visitor to our house was a woman, on August 4, 1892. I had been sitting out on my steps with some of my neighbors. I had some rugs on the steps and after they went home, I had my little girl in my lap and she had gone to sleep. I went in and laid her in the bay window; we have a seat in the bay window. I went out after my rugs and shook them and carried one into the dining-room where it belonged, another into the reception hall where it belonged and started after a chair that was out there and a woman pushed herself into the door and met me in the vestibule. She was a horrid looking woman, there was no woman to her. I think she said 'You probably know who I am. I am the woman your husband loves.' I said 'I admire his taste very much if he does.' She threw herself around and says, 'He loves me, he loves me, Me!' and then she went on to say that if she was me, rather than live with a man and cause every hour of his life to be one living death, she would go down on the wharf and jump into the harbor. She also said that she had a hard time to get along and she thought she ought to have a part of my husband's wages. I said I was perfectly willing she should have them all if he loved her so

well.   I told her several times to leave the house, that I would not be insulted in my own house.   I can hardly recollect anything else that she said.   She told me that Mr. Burrowes [the defendant] didn't write those letters.   I said, 'He is very anxious to get hold of them if he didn't.'   She said that John [meaning the plaintiff] wrote those letters.   No, I will take that back. She said that John had those letters written, and that her brother wrote them for him.   I have never seen the woman since.   I have tried very hard to find her.   She said we were both to be pitied, I for being married to a man that cared nothing for me, and she for loving a man that was tied to another.

"The next visitor that I had about these letters was a gentleman on the sixth, Saturday.   I had company that evening, Miss Chase and I think Mrs. Hayden.   Miss Chase went home first and when Mrs. Hayden went out I went with her.   We looked at the flowers in my yard, and as we were standing there, Mr. Rand, my counsel, came along.   He said, 'Is everything all right?'   I said, 'Yes.'   I think those were his words.   He went along.   Mrs. Hayden went in a few minutes and I went in.   My little girl was asleep in the bay window and was when the ladies went away.   My doorbell rang and I went as I usually do and said, 'Who is it?'   The answer came 'Mr. Larrabee.' I was expecting Mr. Larrabee might call that night about something, and opened the door, of course.   There was a large man stood at the door and he pushed me in and caught hold of my hands and pushed me in and locked the door and in through the vestibule and locked the next door.   In the corner of the hall was a table with a lamp on it and also a lamp in my dining-room.   He blew the lamp out in the hall.   I said, 'what are you going to do, kill me?'   And he said, 'Now that depends on whether you are a nice little lady or not.'   He pushed me into the dining-room and also shut those doors.   I won't be certain whether my curtains were drawn or not.   If they were not he drew them.   I think he drew the curtains.   They were partially drawn perhaps but I can't remember exactly.   He also stated to me that he wanted me to give up the letters I had.   I think I told him I had not the letters with me but he wanted

the letters that had been sent me this spring, not the spring of
1891 but the spring of 1892.   He said it was very essential that he
should see them before my husband came home the next morn-
ing as he claimed he knew he was coming.   He tried every
way to make me give up the letters.   He asked me where they
were, and I made answer that I didn't know where they are.
He asked if Mr. Larrabee had them and I said I didn't
know.   'Has Mr. Rand?'   'I don't know.'   'Are they in
the house?'   'No, sir.'   He insisted that they were in the
house, that it was not at all probable that I would give up these
until after my husband had seen them.   He inquired several
times if they were up-stairs and if they were in the hall and in
the part of the house where they were and also in the kitchen.
He asked me several times about the different places in the
house and continued in that conversation for a long while.   He
held hold of me.   He held my hands, my wrists.   I was on my
knees a part of the time and a part of the time standing up,
when I could.   I was very much frightened, he was not very
gentle with me.   After he had talked to me about that and I
think was convinced that they were not in the house, although
I don't know as he was, he produced a paper — O, he
asked me where the ink and pen was and I told him there was
one in the kitchen and also one in the hall in the writing desk.
He preferred to get the one in the kitchen.   He still held my
hand and we went into the kitchen together, he pushed me in
and he got the pen and ink.   He had this paper, I don't know
as I can tell the exact words on it.   The substance of it was, 'I
sign this of my own free will.   I never supposed for a moment
that Mr. Burrowes wrote those letters ; I have always known
my husband wrote them ; that he had some one in the city that
he loved better than me ; that I have seen and talked with the
lady.'   I think that was about all there was on the paper.   He
asked me to sign the paper.   This paper had reference to anony-
mous letters received by me in 1891.   He pushed me around
considerable and shook me around and told me I had got to
sign the paper ; that he would stay with me until resurrection
morning if I did not.   I am telling this as near as I can.   I

told him they had done everything except kill me and now if he wanted to kill me he could do it; that I never should sign that paper, that I knew my husband did not write the letters and I never should sign the paper, He informed me that he would give me while he was smoking a cigar to sign the paper. He lit the cigar about that time. He had hold of one of my wrists. He forced me on to his knee. I couldn't tell you how long I was there, I couldn't tell you if I was to judge a thousand years. He threatened me with personal violence if I did not sign the paper. I told him if he touched me, I prayed God he would drop dead; and he would. He made me take an oath with the threat that if I didn't take the oath he would carry out his threat. He made me go through the form of taking an oath on my knees. A bible was used. We both got it. I knelt down and kissed the bible, held up my hand like that, and he held on to the other hand. This man pushed his way into the house somewheres near nine o'clock. He stayed there a long while, I don't know as I can tell you exactly, but probably about three or four hours. My little girl was asleep in the bay window all this time; she is seven years old.

"The next one that called at the house was a dude. He called in the morning, Wednesday morning after we had telegraphed for my sister to come. He came famished, and he told me how long it had been since he had anything to eat. I supposed he was very hungry, I have had a good many come that were really hungry. I told him to come in. I was alone and had not a great deal cooked in the house, but I sent to the bakers and got some things and set out quite a good deal for him to eat, expecting he was very hungry. I think he ate half a peach and a little mite of cake and a tiny mite of pie. He informed us he had walked from Old Orchard that morning although his clothes had not a bit of dust on them, and he had on patent leather boots and there was not a speck of dust on them. He informed us he had walked from Milwaukee. He only sat at the table a few minutes. I was very much surprised at the time to think he didn't eat anything, although I didn't connect that with this at the time. A letter connected it, saying it was well I kept a

body guard that night. They came apparently to see if anyone was with me.

"The next visitor, after the dude, who called about these letters, came on Tuesday, September 19th. I was not left alone at all; my husband had been staying with me all the time, or some one else was, so that I should not be alone. This morning he was called away on business at the shop and told me he should return before my son went to school which would be about eight o'clock, he had to start for the high school. I thought I would wash my back window. I put a chair out of my window, out of my back window I think, and stepped out on to Mr. Milliken's shed, a little low shed there is there, and I washed off the outside of the window. This was in the morning, and I wiped the upper part of the window and part way down on the lower sash. When my little boy had started for school he came back and told me there was a gentleman at the shoemaker's shop at the corner of Brackett and Gray streets who said he would watch my front door.

"I was expecting my husband back and this gentleman sent my little boy back to say that my husband couldn't come home just then and he was going to stay there and watch my front door so that if any one came in, he would come, too. The man was, Clarence Cummings, employed in the office of the same company of which my husband is superintendent. I got out on the shed again and washed the outside windows and wiped them and took a chamois skin and wiped the upper part of the window and pretty nearly all the lower part. Then my little boy came and told me this and I got into the window to see what he wanted and I shut the window and locked it. Then I remembered that I had not put up my laundry and the laundry man would be along very shortly. So I picked up my laundry and did it up and by that time it was time for me to get my little girl ready for school and so I washed and got her ready for school and I don't know what detained me, one thing and another and I didn't get back to my window right away. When I got around to it I went and wiped the inside of the window as I generally would after I washed it. I had already washed it inside and I wiped

it. Then I took hold of the window and pushed it up and reached out, I was on my knees, as I had been wiping the lower sash and I reached out to wipe the other side instead of getting out and then some one caught hold of my hands. That was the first conversation I had with any one after the writ was served on Mr. Burrowes. It was the same gentleman that came on the steps and saw me July 27th. It was the one that had conversation with me then. He held both of my hands a part of the time and a part of the time he didn't but he held one of them all the time. He told me it was impossible for me to identify anyone, that it was utterly impossible for me to go on to the stand in the court room and say that Mr. Burrowes had been at my window for I could not tell whether it was him or not. He asked me if I had ever seen him before. I said, yes, three times, I think it was. He said, 'When have you seen me before?' I said, 'You came to my window and talked with me in the night and I saw you'—there was a man came to your house that we call 'gold specs'—'I saw you watching to see if gold specs came to my house all right and I also saw you on the train.' It was four times instead of three times. I also saw you on Tyng street the other night. He said it was impossible for me to identify anyone and he asked me to look at him and see if I would know him if I saw him anywhere else in the condition he was then. He turned his eyes into his nose and took out some teeth and dropped his mouth down the same as an old gentleman would and asked me if I should know him. I said, 'No, I don't think your mother would know you.' He took out two or three of his teeth, I don't know how many, but he didn't take them all out. I think if his face was straightened up again I should know him pretty well. As he appeared after that process I should not recognize him, but I should know him the next time I saw him do it. I should have hated to have been his mother. He said he supposed things had gone so far — Oh, he said they intended to have frightened me so that I could not have been a witness, that that was their intention but I got away from them. That if they had got me they would have put me through a course of free masonry that I never dreamed of. He told me

when I was summoned here as a witness to take an oath, that I must add mentally — that I could add mentally whatever I chose afterwards; that I wouldn't be obliged to tell all I knew. He told me I must contradict myself. They were going to do some awful things to me if I did come in here. He told me that they had been paid for doing it and that they should certainly do it if I came here as evidence. They were going to try and break my testimony down as evidence so I wouldn't be capable of being a witness here. He said if they had got me they would have taken me — he informed me they were all from Canada — and they would have taken me to Canada, that he knew a nice, quiet, little cemetery up there where there was a vault and he would have confined me in it and if I had been capable of giving any testimony then, they would have put me in a casket or into a box and nailed me up so I could hear them as they drove the nails in. I said, 'You wouldn't dare to do such a thing as that.' and he said they never stopped at a little thing like that. There were to be skeletons in the vault. He made me take an oath that I wouldn't go on the stand, and I was frightened. I don't remember, but I think likely a bible was used in taking the oath. He didn't come into the room. He stood outside. I should think the window came almost up to my waist; all I had to do was to put my hand out if I had a bible. I don't think my bible is always in the same place. I think the oath was about the same as the other oath. It was not the same man. I remember the oath was very near like the other. One place at the last he said, 'So help me God.' This was between nine and ten in the forenoon. I screamed once, I remember that; it was when he caught my hands. I can't tell why I stopped screaming, I guess I got used to it. This man referred to the fact that I escaped from him on the seventeenth.

"Saturday, the night of the democratic parade, that evening just as I got through with my dishes some one came to my back door and told me that a friend of mine that lived on York street nearly over to State, next house to State, was sick and asked me if I would come down and stay with her all night as her husband was away. I was going out to the democratic parade

but I started to go down there first. I had been watched all summer and I could go nowhere without having a letter about it or something. Every step I took I was watched. I went the same way I had gone all summer; it was a place I had frequently gone to. I went down Brackett, over Danforth and down Tyng as I usually would go, never went any other way in my life, and as I got down to Tyng street, it is a very dark street and I always look to see if I can see anybody. There is a cross dog there that I am afraid of. At least, he barks but I don't know as he hurts. I looked to see if I could see anyone and there was a close carriage down below that I saw. There is a livery stable down there somewhere but I don't know exactly where. I started down street and when I got down, I don't know who lives in the corner house but Father Murphy used to live there, and below that is a yard and as I got nearly down to that I heard some one say 'There she is,' and I recognized the voice of the big man that was in the dining-room with me if you remember. I thought in a minute what I was out for and I turned and ran back and they after me. When I got out on Danforth street I saw some one coming. I didn't dare to trust anybody but if they had followed me still further I should have gone up to this man. I saw they did not and I kept on home. I passed two or three people. I ran up Danforth and thought of Mr. Rand's and I remembered that he was not at home and I ran up Brackett street home.

"One of these was the big, light man that came to my house and staid from eleven o'clock until one. The other was the man who seized my hands out of the back window on the nineteenth of September. One of them reached out and said, I have got my little,— something, I don't know what. At the time the man was standing at the back window he told me to stand in the window until he got away from the shed, as I was covered. He also told me if I identified anybody in the street as following me, which he had done, there would be some vitriol or something thrown in my face and that I couldn't identify anybody again. There was a man out there in the back lot, another man that I had not seen.

"I have no doubt it was the defendant, Mr. Burrowes, who came to my house July 15. I know it was him as well as I can know anybody. I should say it was a moonlight night but I couldn't tell you certain. I couldn't tell you whether it was a clear or cloudy night, it was clear enough so I could see his face distinctly. I don't think it rained. I don't know whether he had a carriage or not, I didn't see any. Do you wish me to go over the whole of the conversation again? I had gone upstairs with my little girl; as near as I can tell it was the 15th of July. I had read her to sleep and gone to sleep myself as I remember it now. I was awakened by my door-bell ringing. I got up and came down stairs and went to the window, as I always did when I was alone, and I said, 'What is it?' or 'Who is it?' and the answer came, 'A message for Mrs. Pease.' I said, 'A telegram?' and he said 'No, a message.' I said, 'Step to the window and deliver it.' Before that he said would I step to the door. I said, 'Deliver your message at the window.' He came to the window and said, 'Are you alone, Mrs. Pease?' I said, 'No, sir.' He said, 'You have your little girl with you I know but otherwise than that you are alone? I wish to speak to you in private.' I couldn't tell this all in exactly the same language as I used before.

"I said, 'Anything that you may say to me will be strictly confidential.' He made the remark, 'I have come to see you Mrs. Pease in regard to the letters Mr. Burrowes was accused of writing in the unpleasantness that occurred in the spring, the trouble with the post office department; would you be willing to talk with me on the subject?' I said, 'I am listening, go on.' He said, Although Mr. Burrowes did not write those letters everything points to him as being the author and in all probability he will have to answer for them; and he would like to talk with me on the subject. I think it was somewhere near here that I said, 'Is this Mr. Burrowes?' I had thought from his looks that I recognized him and his peculiar way of twisting his moustache that he always has and holding his hand up to his face.

"I thought it was Mr. Burrowes. I said, 'Is this Mr. Bur-

rowes?' He said, 'It wouldn't be well for me to call names. It might be unpleasant hereafter.' He said he thought it was a wrong and unjust thing for a man to suffer through his whole life for one little, thoughtless act. I said, 'Mr. Burrowes, you should have thought of that before.' I called him Mr. Burrowes after that. I said, 'You should have thought of this beforehand and never put yourself into the position you are now in.' He asked me if I knew whether my husband was going to push this case or not. I said, 'I presume he will, he is talking of it now.' He said he would like to settle with me and would do so but he would never settle with J. W. but would fight it to the death. That was his own language. He also asked me if I had those letters. I said if I remember right, that I had not. He said, 'Well, you have access to your husband's private papers while he is away or if not you can have.' He then spoke of our being members of the same church, not of the same church, but of the Methodist church, of our believing in the same creed and in the same Christ. He spoke then about the express command in the bible where it said brother shouldn't go to law against brother. He also quoted the passage, 'Love your enemies, be good to them that hate you, and pray for them that despitefully treat and persecute you.' He spoke of his high position in the community, of his wife and child, and of the shame and degradation that would follow him the rest of his life. I said, 'Mr. Burrowes, I am human ; I have some feeling, I have suffered as much as you or your family ever can.' 'But,' I said, 'if you are truly penitent, I have always said that when you would come out to the world and say you were sorry instead of going to your church and in your closet and confessing your sins, if you ever came to me, — I was the one you had really injured the worst, — if you ever came to me I would meet you half way every time,' and that I would. Then I asked him if he was truly sorry and he said he was truly penitent. I said, 'I forgive you for everything you have done and I will never injure you in any way or shape, with one agreement, and that is : I do not ask you to go before the public and say you are guilty but if anything is said don't stand up and say I am inno-

cent and Mr. Pease wrote those letters to rid himself of his wife,' as I had heard he had repeatedly said. I said, 'Under that agreement if anything is ever said I will never accuse you of it,' and the agreement was made between us that he shouldn't do it. Then we talked, as near as I can remember, — I was crying then — we talked about whether I could obtain the letters or not, and whether I had any influence over my husband. I said I knew I had some influence over my husband and if I could procure the letters I would hand them all over to him. He said he had faith enough in me to believe that if I promised to destroy the letters he would know that they were destroyed if they were never handed over to him. After that we talked about my getting the letters and about our not pushing this case, as he expressed it several times to me. I don't know particularly now, but perhaps I have not stated it as I did this morning, and then he turned deliberately around and said, 'Mrs. Pease, I have really not sinned any, the contents of the letters were true; the crime was only in my having written it to you.' That cut me like a stab after I had forgiven him. I said, 'Mr. Burrowes, our agreement is broken; you have broken yours and I break mine.' I closed the window and went up stairs. He had a very low, sweet, musical voice, more like a woman than a man, rather a hesitancy about it, if anything, nothing, perhaps, nobody would notice, a little slow.

"After the letter of July 20, I continued to receive other anonymous letters, I do not think I can tell how many. Mr. Burrowes called the night of the 15th as near as I can place it. I got a letter the 20th. I got a letter the 27th. (This is as near as I can tell you.) I got a letter the 27th preceding the gentleman that talked with me on the steps; he came that night. August 2d, the letter was picked up on my steps, I think August 2d. August 4th the woman called. August 6th the man called at night, the big man Saturday night, August 6th. I sent a telegram for my sister Monday. She came Tuesday and Wednesday the dude called, Wednesday morning, the 10th. The 11th I received two letters threatening me. I think I got no more letters until I went into the country. I think I got no

more letters between August 11th and August 17th when I went into the country and then this man that talked with me on the steps was on the train and I suppose he threw the letter in my lap.   I found one in my lap.

"If my counsel wish to produce the letters I received July 20, they may, otherwise I refuse."

The cross-examination of the witness, as to interviews with strangers about the letters claimed to constitute the libel in this case, had some fourteen months after they were written, was objected to as irrelevant and immaterial.

The court overruled the objection and expressly admitted the evidence as a legal right, and not merely in the exercise of discretion in the control of cross-examination.

The competency of the evidence, therefore, must be considered as to whether it has any probative force upon the issues on trial, and might be considered and weighed by the jury in deliberating upon the verdict.

It cannot be treated as immaterial and harmless and allowed to stand in the case on that ground, inasmuch as some parts of it, especially the statements of the witness as to what other persons than the defendant told her about the authorship of the letters, is of so mischievous a character that it would certainly influence the jury in determining that question.   The declarations of strangers, purely hearsay, as to a fact on trial, when heard by a jury, cannot fail to leave some impression.   A jury may not distinguish between the statements of strangers made out of court and not under the sanction of an oath, and testimony given under oath before them.   If allowed to hear both, they are apt to consider both ; therefore the admission of such evidence cannot be excused as immaterial and harmless.   *Woodroffe* v. *Jones*, 83 Maine, 21 ; *Royal* v. *Chandler*, 81 Maine, 118.

It is not pretended by the defendant that the evidence in question, standing alone, had any force to prove the facts stated by the witness, and especially to prove the authorship of the letters to be or not to be as stated by the persons interviewed ; of course it was not competent for such purpose ; and it is presumed that the court so instructed the jury, and properly cau-

tioned them in that regard, as the charge of the presiding justice is not made a part of the case and is not before us, and nothing in the case indicates the contrary.

But, it is stoutly asserted that the evidence shows such a state of mental illusion or unbalanced mind touching the libellous letters as to affect the credibility of the witness in regard to them, and discredit her evidence in chief upon the same matter. If the evidence be competent for this purpose, the verdict must stand, otherwise, be set aside.

Insanity destroys the competency of a witness; and the ancient rule was that the question of competency must be determined when the witness is called, and before he is sworn. *Turner* v. *Pearte,* 1 D. & E. 407; Gilbert, 282; Swift, 109; Peake, 129; Starkie, 123; Phil. Ev. c. 5, § 7.

This rule, however, has become relaxed in cases where the incompetency first appears from the testimony of the witness, himself, and, perhaps, in some cases where the fact is to be shown *aliunde*. *State* v. *Damery,* 48 Maine, 327. The objection should be made as soon as known, 1 Greenl. Ev. § 421. If, therefore, the insanity of Mrs. Pease had been made to appear during her examination upon the stand, it would have been cause for excluding her testimony altogether; and the presiding justice, whose judicial experience covers a period of more than thirty years, would not have failed to discern it.

It was not contended that her aberration of mind was of such a pronounced character as to render her incapable of understanding the nature of an oath and render her incapable of testifying at all; but that these letters, that she attributed to the defendant, had so excited and unbalanced her as to create a fancy and imagination touching the subject that was so unreal and extravagant as to make her feel that fancy was real and that illusions were truth.

The evidence objected to is before the court. It is of a most extraordinary character, and, in the mind of the witness, is directly connected with the defendant as the author of her trouble. It shows extreme intensity of belief that he was the author and publisher of the libels complained of. Her inter-

view with him is given with peculiar detail of circumstance. Her interviews with the other persons are of extravagant conception, and in her mind are interviews with his emissaries. He is imagined by her to be at the bottom of the whole. A mind inflamed with extravagant improbabilities upon one subject, may be truthful in part, and fanciful in part, and where the exact division should be placed between truth and fiction cannot be arbitrarily fixed.

The mind upon a single topic should be considered a unit, and its varied phases must be all taken into account, in order to have accurate judgment of the views it holds. The peculiarities of this case show that the witness believed of the defendant conduct that is both reasonable and unreasonable, credible and incredible; that she believed others, instigated by him, guilty of conduct that a rational person cannot consider real; and would it not be dangerous to say that a jury might hear one part of her account and remain ignorant of the rest? To her it was a unit. To those who are to judge of its truth a unit it should remain.

There is force in the suggestion that the interviews with strangers, related by the witness, occurred more than a year after the libellous letters were written and delivered, one of them, as she says, by the defendant in person; but, on the other hand, the case shows much controversy of a rancorous nature between the defendant and the plaintiff, who is the husband of the witness, calculated to intensify her belief in the identity of the defendant as the bearer of the last libellous letter. This hostility between the parties might, naturally enough, by the lapse of time, confirm the witness in her supposed identification, and, especially so, when the nature of the letters is considered, constantly pricking her mind like a thorn in the flesh, the continued controversy adding new irritation, like caustic upon a sore, until it became so thoroughly upset that imaginations became terribly real. She imagined that Burrowes or his emissaries constantly beset her, both in public and private. Wherever she went, they seemed to pursue her like her own shadow, of which she could not rid herself.

The mind of a witness may be compared to a camera. When properly adjusted, it records a true picture painted by the sun ; but when unskilfully used, produces a distorted, extravagant, and untruthful likeness. A photograph, when shown to have been skilfully taken, may be used as evidence of existing objects ; but suppose on cross-examination of the artist, it were shown that the camera was so used that it might produce an untrue picture, could it be said that such evidence ought not to be considered by the jury in determining how far the camera had reproduced the truth?

Suppose a phonograph apparently repeats discourse, recorded by it, correctly, and it were shown that its mechanism had become disarranged so as to transpose the discourse, and destroy its coherency or impair its lucidity, would not the truthfulness of the instrument be discredited or impeached? Or suppose the mechanism of a music box be shown to have been injured, so that it omitted some parts of the music, would not its accuracy of expression be impaired? And suppose the omission be noticed, should it not properly be inferred that the mechanism had become disordered? Or if the discourse of the phonograph be recognized as imperfect and incoherent, or the photograph be seen to be out of well-recognized proportions, would it not naturally be inferred that the mechanism of the former had become disarranged, and that the camera had been improperly used?

The human mind may be compared to a machine, and, like it, makes no mistake, when normal. The mind of the witness in this case contains knowledge, impressions, convictions and conclusions, touching the issue on trial. All these had been previously gained from the use of her senses. Her knowledge was material for the jury to know ; not what she thought, not what she fancied, not what she imagined, but what she knew. She told what she supposed she knew, but a part of her account is incredible. To her, it is just as real as any part of her story. To us it is pure fiction. Now there is no suggestion of dishonesty. The difficulty cannot be disposed of by saying, "the witness lied ;" for she appears to have been sincere and desirous

of telling the truth. She doubtless thinks she has told it. How much truth she has told is difficult to say, and why? Because her discourse discloses a disordered brain, as to the matter on trial. The disorder may have been caused by continued agitation over the facts testified to by her in chief; but our knowledge of them comes through a disordered intellect, a defective machine. This medium must be considered in judging of the picture it shows, or the truth it conveys.

Witnesses laboring under partial mania may be trustworthy; more especially when the subject of inquiry is remote from the subject of delusion. But, when the subject of inquiry is the subject of delusion, care should be taken lest the, "dagger of the mind," be mistaken for the real dagger. Browne on Insanity, § 451.

The adjudged cases upon this subject are few; but the doctrine of them seems to be, that the condition of mind, if capable of appreciating truth, must go to the credibility of the witness, and be submitted to the jury. In *Regina* v. *Hill*, 5 Cox, C. C. 259, (1851,) Donnelly, a patient in a lunatic asylum, was called as a witness for the crown, to testify on the trial of the defendant, an attendant in the asylum, for the homicide of a patient. He testified that he was possessed of spirits; that they spoke to him constantly by day and by night; said he, "They are now speaking to me; they are not separate from me; they are round me speaking to me now; but I can't be a spirit, for I am flesh and blood; they can go in and out through walls and places where I cannot. I go to the grave; they live hereafter, etc. When I swear I appeal to the Almighty; it is perjury, the breaking of a lawful oath, or taking an unlawful one. He that does it will go to hell for eternity." On cross-examination he said: "These creatures insist upon it, it was Tuesday night, and I think it was Monday. The spirits assist me in speaking of the date. I thought it was Monday, and they told me it was Christmas eve, Tuesday; but I was an eye witness, an ocular witness, to the fall to the ground."

On appeal a conviction was upheld. Lord Campbell, in delivering the judgment, said: "It is for the judge to say,

whether the insane person has the sense of religion in his mind, and whether he understands the nature and sanction of an oath, and then the jury are to decide the credibility and weight of his evidence. . . . The proper test must always be, does the lunatic understand what he is saying, and does he understand the obligation of an oath? The lunatic may be examined himself, that his state of mind may be discovered, and witnesses may be adduced to show in what state of sanity or insanity he actually is; still if he can stand the test proposed, the jury must determine all the rest."

This doctrine was commended by the Supreme Court, in a case where a plaintiff testified in his own behalf concerning his injury, received by falling upon a street, producing partial paralysis and impairment of mind. "His statement was not always as direct and clear as would be expected from a man in the full vigor of his mind; still it was not incoherent nor unintelligible, but evinced a full knowledge of the matters in relation to which he was testifying." Hospital physicians testified to his impairment of memory and derangement, attempted suicide and the like, and his feebleness was apparent while on the stand. The court was requested to exclude his testimony, but declined, and submitted his credibility to the jury. On error for not excluding the witness, the Supreme Court affirmed the judgment below, quoting at length from the English case, and said: "The doctrine of this decision [*Regina* v. *Hill*] has not been overruled that we are aware of, and it entirely disposes of the question raised here." *District of Columbia* v. *Armes*, 107 U. S. 519 (1882).

In the case at bar, the cross-examination of the witness fails to show a weakened intellect and hardly monomania. Monomania is insanity upon a particular subject, and it would seem, when shown, to require the exclusion of all testimony from the witness upon that subject, for the same reason that insanity excludes a witness altogether. It is insanity upon one subject, leaving the mind sane upon all other subjects. The test laid down by the English case could rarely exclude the monomaniac, and perhaps never, unless the monomania related to the subject matter of

giving testimony, and then, it would seem, the test of moral capacity,—the obligation of an oath and a desire to speak truly,—would be the same as in any case of insanity or general weakness of intellect. It would naturally follow that the same quality of mind in each should exclude or admit the witness.

In the case at bar, the witness apparently understands and comprehends the obligation of an oath, and appears desirous of telling the truth. By *post hoc* reasoning, based on the incredibility of her story, it is inferred that her mind imagines fanciful occurrences as real. The court cannot say her illusions render her testimony altogether unreliable as to some occurrences within her ocular vision, as for instance, in the identification of Burrowes as the bearer of the second libellous letter. On the other hand, her illusions in regard to him and his conduct subsequent to her supposed identification of him, in some degree at least, weaken the same. They do not utterly destroy her testimony on the point, but raise doubts as to its accuracy and reliability; and, certainly, the cause of such doubts should be considered somewhere, and if not sufficient to be acted upon by the court in excluding her testimony altogether, must be considered by the jury or not at all.

The plaintiff has no reason to complain of this view, for the only apparent cause for the delusion of the witness is some act of the defendant; naturally the publication of the letters, and if he be wholly guiltless of them, how could her delusion as to them and him have arisen? Is it likely to have been fabricated out of whole cloth? If so, she must have written the letters herself, and this is not suggested in the record, although many experts in handwriting have testified upon the handwriting of the letters.

Whether the case of *Swartz*, tried at Wiscasset in this State, in 1883, and cited at the bar as reported by Dr. Ray in his Medical Jurisprudence, § 528, and also in Browne, § 454, was correctly decided by the jury, in view of the corroborating, almost controlling evidence outside of the testimony of the government witness, whose mind was deranged upon the subject of religion, is questionable. The two authorities cited disagree

upon that question, but both concede the cross-examination of him showing the delusion to have been competent.

With the merits of the case at bar we have no concern. The plaintiff does not ask a revision of it upon that ground. The only question presented is a purely legal one, and of that we think he has no just cause of complaint.

*Exceptions overruled.*