STATE of Maine

v.

Robert CEDRE.

Supreme Judicial Court of Maine.

Feb. 4, 1974.

Richard S. Cohen, Deputy Atty. Gen., Fernand Larochelle, Asst. Atty. Gen., Augusta, for plaintiff.

Franklin F. Stearns, Jr., Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

DUFRESNE, Chief Justice.

Charged by indictment dated March 23, 1971 with the unlawful killing of one William T. Culliton on February 18, 1971 in the Town of Casco, in the County of Cumberland, the defendant-appellant was tried before a Cumberland County jury and convicted of murder in April, 1971.

Having designated only a portion of the record and proceedings below for inclusion in the record on appeal, Cedre has pinpointed under Rule 39, M.R.Crim.P. (Rule 74(d), M.R.C.P.) as alleged errors to be considered on appeal the following:

1. The Presiding Justice erred in refusing to grant the motion for judgment of acquittal made at the conclusion of the State's Case.

2. The verdict is contrary to the weight of the evidence.

3. The verdict is not supported by substantial evidence.

MOTION FOR JUDGMENT OF ACQUITTAL.

Following the denial of his motion for acquittal at the close of the State's case, the appellant took the stand and testified in defense. He presented witnesses to support his alibi, that, during the hours in which the homicide might possibly have been committed, he was nowhere near the scene of the crime, but was in a tavern in Lewiston, Maine. The record reveals, however, that Cedre did not move for judgment of acquittal after the close of all the evidence, nor did he do so at any time after the jury verdict of guilty, as he could have done pursuant to Rule 29, M.R.Crim. P.[1] It further appears that he did not make a motion for a new trial under Rule 33, M.R.Crim.P.,[2] which by the mandate

1. RULE 29. MOTION FOR ACQUITTAL
   (a) Motion for Judgment of Acquittal. Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the State is not granted, the defendant may offer evidence without having reserved the right. If a motion for judgment of acquittal is made at the close of all the evidence, the court may reserve the decision on the motion, submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.

   (b) Motion after a Discharge of Jury. If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within ten days after the jury is discharged or within such further time as the court may fix during the ten-day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal. If no verdict is returned the court may enter judgment of acquittal. It shall not be necessary to the making of such a motion that a similar motion has been made prior to the submission of the case to the jury. A motion for new trial shall be deemed to include a motion for judgment of acquittal as an alternative.

2. RULE 33. NEW TRIAL
   The court on motion of the defendant may grant a new trial to him if required in the interest of justice. If the trial was by the court without a jury the court on motion of a

of Rule 29(b) must be deemed automatically to include a motion for judgment of acquittal as an alternative.

True, the record discloses that on November 11, 1971 the appellant filed a motion for a new trial on the ground of newly discovered evidence. This motion was heard by the trial Justice on December 1, 1971 and denied. Cedre has not appealed from this ruling and has not included the evidence in support of his motion as part of the record on appeal.

■ The motion for a new trial based on the ground of newly discovered evidence is sui generis. See, Moore's Federal Practice (2nd Ed.), § 33.03 [1]. It has always been treated differently from the general motion for a new trial based on the ground that the verdict is against the law, and the evidence. See, State v. Dodge, 1925, 124 Me. 243, 127 A. 899.

■ In stating that a motion for new trial shall be deemed to include a motion for judgment of acquittal as an alternative, Rule 29(b), M.R.Crim.P. has reference to the general motion for new trial, the purpose of which is to test the sufficiency of the evidence to support a verdict of guilty. The motion for a new trial based upon newly discovered evidence serves an entirely different function and as such does not incorporate in itself the motion for judgment of acquittal as an alternative.

Thus, when Cedre offered evidence after his motion for acquittal at the close of the State's case was denied, he waived any right which his motion might have provided him unless he renewed it, either at the close of all the evidence or seasonably after verdict. Rule 29, M.R.Crim.P. Alternatively, the filing of a general motion for a new trial made within ten days after verdict of guilty under Rule 33, M.R. Crim.P. would have laid the proper foundation for appellate review of appellant's right to secure a judgment of acquittal and prevented the applicability of the doctrine of waiver. See, State v. Rowe, 1968, Me., 238 A.2d 217; State v. Pullen, 1970, Me., 266 A.2d 222; Maine Practice, Glassman, § 29.2.

■ "An appeal from a judgment whenever taken preserves for review any claim of error in the record including any claim of error in the denial of a motion for a new trial, the denial of a motion for judgment of acquittal, or the denial of a motion in arrest of judgment." Rule 37(a), M.R. Crim.P. In the instant case, where the motion for judgment of acquittal at the close of the State's case was waived and no general motion for a new trial was made, the appellant did not preserve for review the issue of the sufficiency of the evidence to support the jury verdict of guilty.

■ Being mindful, however, that justice may require that we notice on appeal plain error affecting substantially the rights of an accused, especially in a case involving imprisonment for life, we have made a thorough review of the record. Even if the issue of the sufficiency of the evidence to support the verdict of guilty were properly before us, the appellant would gain nothing thereby, since, in view of all the testimony the jury was justified in believing beyond a reasonable doubt that Cedre was guilty of the unlawful killing of Culliton under such circumstances as to make the crime punishable as murder.

defendant for a new trial may vacate the judgment if entered, take additional testimony and direct entry of a new judgment. A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case; upon the filing of such a motion while an appeal is pending the clerk of the court shall immediately send notice to the clerk of the Law Court of the filing of such a motion. A motion for a new trial based on any other ground shall be made within ten days after verdict or finding of guilty or within such further time as the court may fix during the ten-day period.

State v. Goldman, 1971, Me., 281 A.2d 8; State v. Arsenault, 1956, 152 Me. 121, 124 A.2d 741.

Indeed, it is clear beyond any doubt that William T. Culliton was the victim of an unlawful homicide. He was found dead on February 18, 1971 in a driveway leading to Crescent Lake in the Town of Casco with six bullets in his body. The State produced an eye witness to the shooting, and, although his credibility was under strong attack by reason of self-incriminating statements which defense witnesses testified he made, his testimony was not incredible. Furthermore, other State witnesses gave corroborating testimony in the nature of admissions by the defendant from which a jury, in the totality of the evidence, could justifiably conclude beyond a reasonable doubt that Cedre was the murderer.

## CLAIMED ERROR IN THE ADMISSION OF EVIDENCE

The appellant has briefed two other issues. First, he claims that there was an obvious error affecting his substantial rights, which was not objected to at trial and which he contends we should entertain. Rule 52(b), M.R.Crim.P.[3]

This claim of error is based on the following evidentiary sequence. One David Elder, a State's witness, testified on direct examination to two visits to the apartment of Richard and Anita Ducharme on Elm Street, in Auburn, the first being at about 10:00 o'clock in the evening of February 18, 1971 and the other around 1:00 a. m. of the next day. On each visit, along with the Ducharmes, Elder stated that Cedre was in the living room with Daniel Laliberte (another State witness) and one Merrill T. Currie, Jr. Speaking first of the second visit, Elder's testimony ran as follows:

3. Rule 52(b) *Obvious Error.* Obvious errors or defects affecting substantial rights may be

"Q. Now what, if anything, did you observe when you got there and went into the apartment?

"A. Bob Cedre and Danny Laliberte was sitting on one side of the room and Deke and his wife were on the other side, and Buddy Currie was sitting alone.

"Q. Did you make any further observations at the time?

"A. I noticed, when I came in, Deke got up to talk to me, and Buddy Currie, I noticed him cleaning a gun.

"Q. You noticed Buddy Currie cleaning a gun. What, if anything, did you notice further at that time?

"A. That it was a .25 automatic, *and the people in the house appeared to be very upset at this time."* (Emphasis ours.)

On motion to strike by defense counsel, the Court below instructed the jury as follows:

"The witness's statement beginning, 'it appeared to me,' about the people will be stricken from the record. The Jury will understand that when the Court orders testimony stricken from the record, this is the same as though the words had never been spoken by the witness, and the Jury is to disregard completely any statements of the witness which have been stricken.

"You try to answer the questions that are asked of you, Mr. Witness, to the extent that if you are asked to testify as to what you saw or what you did or what happened, you will limit yourself to what you saw or what you did or what you observed, and not any conclusions or impressions."

noticed although they were not brought to the attention of the court.

When addressing himself to the first visit and asked to disclose any conversation in the presence of the appellant at that time, Elder answered:

"Deke [meaning Mr. Ducharme] told me to leave and to return later on, that he was having *an important conversation* and didn't want to be disturbed." (Emphasis added.)

Counsel for the appellant contends that the introduction of the hearsay statement of Ducharme that he was having an important conversation and didn't want to be disturbed, acknowledgedly made in the presence of Cedre at a time when Cedre was aware of Culliton's death, when related by the jury, consciously or unconsciously, to the other statement made on Elder's second visit to the effect that the same people appeared to be very upset, viewed with the fact that the gun in the room was of the same caliber as that of the weapon with which Culliton was slain, was so potentially prejudicial to the appellant as to cause the jury to disregard the cautionary instruction respecting the stricken statement concerning the persons' emotional appearance and constitutes obvious prejudicial error to be noted, though raised for the first time on appeal.

We are faced with a threshold barrier before we may consider this issue, as well as the second issue briefed. Neither of the two issues was designated as a point on appeal in accordance with the requirements of Rule 39, M.R.Crim.P. (Rule 74(d), M.R.C.P.)[4] In State v. Harriman, 1969, Me., 259 A.2d 752, at 753–754, this Court refused to consider an issue, where the requirements of the rule were not complied with. See also, State v. Levesque, 1971, Me., 281 A.2d 570.

In State v. Ferris, 1969, Me., 249 A.2d 523, the appellant sought to raise as an issue on appeal, whether there was error in the instructions to the jury that self-defense was an affirmative defense which must be proven by the defendant by a preponderance of 'the evidence, when no objection was made to the charge at the trial level and the claim of error in regard to the instruction was not included in the designation of points on appeal. We concluded in *Ferris* that, if there was error in the area of the presiding Justice's charge it was not of a highly prejudicial nature and calculated to result in an injustice and under such circumstances, we stated that we would not consider it.

We are faced with a similar situation in the instant case. In the first place, the hearsay statement to the effect that Ducharme was having an important conversation and did not want to be disturbed seemed so innocuous at trial that even counsel saw then no prejudicial tendency. Furthermore, the cautionary admonition to the jury by the Justice below to disregard Elder's statement that the persons in the room appeared to be very upset, such evidence having been stricken from the record, was full, precise and could not have been misunderstood by the jury.

■ We must presume that the jury followed the trial Court's instructions. State v. Trask, 1966, 223 A.2d 823; State v. Wright, 1929, 128 Me. 404, 148 A. 141.

■ Ducharme's alleged statement that he was having an important conversation and did not want to be disturbed does not carry per se any inherently nefarious connotation and cannot be characterized as evidence of a highly prejudicial nature. Even if considered in the context of the stricken evidence that the persons appeared very upset, such statement cannot be deemed prejudicial to the appellant, espe-

4. Rule 74(d) Statement of Points. "If the appellant does not designate for inclusion the complete record and all the proceedings and evidence in the action, he shall serve with his designation a concise statement of the points on which he intends to rely on the appeal, *and any point not so stated may be deemed waived.* No such statement shall be deemed insufficient if it fairly discloses the contentions which the appellant intends to urge before the Law Court." (Italics ours.)

cially when the possible murder weapon was at the time in the hands of another.

Assuming that the admission of this evidence was error, a point upon which we express no opinion, upon consideration of this record we see no prejudice to the appellant.

The other issue briefed and argued, but not saved in the designation of points on appeal, may be fleshed out by the following narration.

Daniel Laliberte, in his direct testimony for the State, related to the jury several bits of conversation which the appellant Cedre had with him shortly before and after the death of Culliton. Around 3:30 in the afternoon of February 18, 1971 Laliberte met Cedre at the Sportsman Tavern in Lewiston. Asking Cedre if he was going back to Portland so that he could ride back with him, Laliberte was told that "he [Cedre] wasn't going right away, he had business to take care of. He was going to take care of Bill [meaning Bill Culliton, the prospective victim]." That same evening, again at the Sportsman at 7:30 or 8:00 p.m., so testified Laliberte, Cedre gave him the information—"It's all over." Confirming his own presence at the Ducharme apartment and Elder's two visits during that night, Laliberte then disclosed the details of the murder which Cedre purportedly imparted to him while they were driving to Portland on the nineteenth.

"Q  I would ask you whether or not you had any conversation with Robert Cedre on the way to Portland?

"A  Yes. I asked him if the car we was in was the one he had, you know, earlier that night, that night, because I was a little nervous, and he said no, it wasn't.

"Q  Are you talking about that night, referring to Bill Culliton?

"A  Yes.

"Q  And what further was said, please?

"A  And then I asked him if he had the gun or anything, and he said no, he didn't have the gun.

"Q  What further did he say about that?

"A  Then, well, I asked him if anybody saw him do it, and he said no. He said, yes, he said, just a few people, and I asked him who the few people were, and he told me it was Mike Morris, Gene Lecompte and then I asked him, well, 'What did you do with the body' or 'How did you do it?' And he told me they walked, they just told Billy they were going to transfer him because the police might find him, you know, and they said that they got out of the car and Gene and Billy were walking up ahead, you know.

"Q  Who was walking ahead?

"A  Gene Lecompte and Billy and him, and Mike stayed behind.

"Q  And what further was said by Robert Cedre, if anything, to you?

"A  Well, he said that he fired four shots in the back and he shot him in the head three times.

"Q  Was there any further conversation?

"A  Well, I asked what he did with the gun, and he said he just left it behind.

"Q  Behind where?

"A  At the apartment. Somebody else would take care of it.

"Q  Deke Ducharme's apartment?

"A  Yes.

"Q  Is that all that was said about the gun?

"A Yes.

"Q Was there any further conversation about the killing of Bill Culliton?

"A Well, I just asked him if they probably moved the body or anything, and he said no.

"Q Now I take it that sometime then, is that the extent, as you remember the conversation, about what happened that night regarding Bill Culliton and the death of Bill Culliton?

"A Yes."

To counteract such damaging testimony against his client, appellant's counsel brought out on cross-examination of Laliberte that he had been using drugs for four or five years and had been on methedrine for a year or so. He denied hallucinating from drugs in the last three or four years and repeatedly disavowed having a habit, although conceding that he was known as a "three-dime-a-day" man, meaning that it would cost him $30 per day if he had to buy the methedrine. He explained that his acquisition of the drug was made possible by his earning the same in kind through the sale of narcotics for somebody else.

To further discredit Laliberte's testimony regarding Cedre's incriminating statements, appellant's counsel sought to contradict Laliberte's denial of drug addiction. One Deborah Lee, Cedre's girl-friend, testified for the defense at trial and when she was asked to relate what transpired at the home of one Cheryl Vantresca on Washburn Avenue, in Portland, following Culliton's death, in connection with Laliberte's conduct at that time, the State objected. The appellant made the following offer of proof in the absence of the jury.

"I believe that he [Laliberte] testified on cross-examination yesterday that he used Methedrine to quite an extent, but it was not a habit of his. He further said that only on one occasion, I believe, did he have hallucinations and did he call up anybody, did he bother anybody. He said only one time he thought the Iron Horseman, or he said (sic) [had] some idea some place had been blown up and that they were blaming him for it.

"Now I believe I can show that all during this period, that this man, LaLiberte, was causing people constant trouble by complaining to them that the State was after him, that everybody was after him, that he was on a constant trip until he was taken in and put in jail for some reason or other . . . .           .

"At that time, I only seek to show that his testimony should be, or at least I feel it should be, the Jury could take some cognizance of the fact that this man was actually acting like a person who was not thinking clearly and not talking clearly, . . .."

The lower Court's position in sustaining the State's objection was expressed as follows:

"The Court:

"Now I have indicated to you the Court's position with respect to this testimony. If you have evidence that would indicate a prior or other contradictory or inconsistent statements or any inconsistent conduct, if I can go that far, that is contrary to what these witnesses, any of the State's witnesses have testified to, I am certainly going to permit you to offer that testimony, but if we are dealing with Mr. Laliberte, I again will call your attention to the fact that this man, I think without any hesitation or question, has admitted to his condition with respect to drugs so that you are not permitted to show that in contradiction. In other words, that contradicts nothing.

" . . . this witness has testified to his taking of drugs, the extent of his drug use. And I will not permit you to show, through other witnesses, the extent of his drug use or what his condition was, . . ."

Notwithstanding his failure to comply with the provisions of Rule 39, M.R.Crim. P. as previously noted, we have examined this issue in the light of its potential effect, if error there was, upon the substantial rights of the appellant. We hold that the presiding Justice did not abuse his discretion and that there was no error in his ruling.

In order to determine the correctness of the decision below, we must have in mind the posture of the evidence at the time the issue arose and the manner in which the appellant attempted to discredit the State's witness. Daniel Laliberte, under cross-examination by appellant's counsel, candidly admitted that he had been a user of drugs since he was released from military service in 1968 and that he had been on methedrine for a year or so prior to the events he was recalling in his testimony. He conceded that some three or four years previously he did hallucinate when taking "acid." He denied hallucinating from drugs, especially from "speed," except for some recurrences or flashbacks of his "acid" hallucinations. He did testify, however, it was fair enough to say that most every day in the month of February, except for two or three days, he used "speed." He denied being on a constant trip during that month. He further testified that the use of "speed" did not affect his memory at all, but he did say:

"You hallucinate maybe after a period of five or six days. You get on a mental trip, but you don't see things, your mind gets in some sort of state."

He further explained that his drug use caused him to think somebody was a policeman, when he was not, something of that nature. None of the witnesses who came in contact with Laliberte on the eighteenth or nineteenth of February disclosed the quantity of drugs Laliberte might have taken, nor its effect on him, except that Cedre did state, when referring to the ride from Auburn to Portland on the morning of February 19:

"We didn't talk very much because he [Laliberte] was really flashing, that means he was falling asleep."

The witnesss, Laliberte, had insisted during cross-examination that he had no drug habit, in other words, that he was not an addict. It is obvious that the appellant's counsel was seeking to discredit the witness by showing, not in cross-examination, but through the introduction of extrinsic evidence of particular drug-related conduct, that he was an addict, contrary to the witness's firm disavowals.

■■■ Laliberte's testimony upon his examination in chief gave the strongest corroborating support to the eye-witness's version that the appellant had murdered William Culliton. Evidence having a tendency to show that, when he made his observations and recorded in his memory the perceptions and factual information to which he testified, Laliberte was suffering from some mental illusion or hallucination which affected disparagingly his mental capacity to see and hear normally and correctly retain, is competent for jury consideration. The correct account by a witness of knowledge previously obtained depends upon the capacity of the witness initially to properly ascertain what is to be seen and heard and thereafter to faithfully retain it in memory. Pease v. Burrowes, 1893, 86 Me. 153, 29 A. 1053.

■■■ That addiction to drugs generally, or to any particular drug, per se impairs the powers of observation, understanding and retentivity of the witness to such an extent as to affect his credibility, is not a fact of such general knowledge that courts would be warranted in taking judicial notice of it. See, Weaver v. United States, 1940, 8 Cir., 111 F.2d 603. The Illinois Court holds otherwise. People v. Strother, 1972, 53 Ill.2d 95, 290 N.E.2d 201.

The state of the law on the subject may be found in 52 A.L.R.2d 848, 849, wherein it is said:

"Although the authorities are somewhat conflicting, the rule supported by

the majority of the cases seems to be that for the purpose of discrediting a witness, evidence is not admissible to show that he is a user of opium, morphine, or similar drugs, or to show the effect of the use of such drugs, unless it is proven that the witness was under their influence at the time of the occurrences as to which he testifies, or at the time of the trial, or that his mind or memory or powers of observation were affected by the habit." State v. Parton, 1972, Mo., 487 S.W.2d 523; People v. Smith, 1970, 4 Cal.App.3d 403, 84 Cal. Rptr. 412.

In Fields v. State, 1971, Alaska, 487 P.2d 831, the late Chief Justice Boney expressed fully what we believe to be the better view:

" . . . [E]vidence of narcotics use or addiction will not be admissible where its only purpose would be to impeach a witness by showing that he is, by sole virtue of his addiction, inherently unreliable. Our holding does not mean that evidence of addiction to heroin will never be admissible to impeach a witness. Where evidence of addiction tends to show that the witness was under the influence of narcotics either at the time of trial or at the time of the occurrence to which he testifies, where the evidence proves that his ability to perceive, remember, and testify are substantially affected by his habit, or where such evidence would be independently admissible under some other theory, it should not be excluded."

In State v. Warren and Phinney, 1973, Me., 312 A.2d 535 this Court held that a criminal defendant has the right to introduce evidence tending to impeach the credibility of the prosecution's witnesses. In that case, it was ruled error not to receive official documents revealing a psychiatric diagnosis of mental impairment of a prosecution witness to be supported by expert evidence of the existence of such impairment at the times material to the State's case.

In State v. Goldman, 1971, Me., 281 A.2d 8, where counsel for the defendant was attempting to establish a prosecution witness's inability to recall relevant facts, we held it was not error for the court to preclude defense counsel from pursuing a line of questioning which would have shown that the witness had received shock treatments while at a State mental institution, without an offer of proof of competent medical testimony to support its potential materiality.

We quoted in *Goldman* from 97 C.J.S. Witnesses § 57b, at p. 446:

"Unsoundness of mind does not per se render a witness incompetent, the general rule being that a lunatic or weakminded person is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath and is capable of giving a correct account of the matters which he has seen or heard with respect to the questions at issue. The decision as to the competency of such a person to testify rests largely within the discretion of the trial court."

The jury, through cross-examination of Laliberte, was fully informed of facts bearing on the weight to be given his testimony because of his use of drugs, including the extent to which he may have been influenced by the same on the eighteenth and nineteenth of February.

The extent and scope of impeachment testimony lies within the limits of judicial discretion. State v. Warren and Phinney, supra.

There was no abuse of discretion in preventing defense counsel from further probing into the witness's use of drugs on a particular occasion subsequent to the time where the occurrences testified to by the witness took place. Laliberte's conclusory denial that he had no habit, after dis-

**800**

closing the full extent of his drug usage did not render admissible evidence of a specific event outside the relevant time period, in the absence of expert testimony to show its relation back to the eighteenth and nineteenth of February.

The entry will be

Appeal denied.

WEBBER, J., sat at argument, but retired before this opinion was adopted.

All Justices concurring.