**STATE of Maine**

**v.**

**Arnold GOLDMAN.**

Supreme Judicial Court of Maine.

Aug. 26, 1971.

---

Smith, Elliott & Wood, P. A., by Charles W. Smith, Saco, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK, and ARCHIBALD, JJ.

ARCHIBALD, Justice.

The Defendant, with two others, on January 24, 1968, was charged by indictment with the crime of conspiracy. The essence of the alleged conspiracy was that the Defendant agreed to engage in the illegal activity of bookmaking. After an unsuccessful attack on the sufficiency of the indictment, and the consideration of other pre-trial matters, including a ruling on the Defendant's motion for a Bill of Particulars, the case finally came to trial on January 27, 1969. On February 3, 1969, the Jury returned a verdict of guilty, from which conviction an appeal was noted. On October 22, 1969, the Defendant filed a motion for a new trial on the grounds of newly discovered evidence. This motion was denied and an appeal taken from this ruling. The case is before us on appeal from both the conviction and the denial of this motion for new trial.

We will consider first only the Points of Appeal which the Defendant relies upon following the verdict of guilty, which are:

"(1) That the Court erred by erroneously admitting evidence during the course of the trial prejudicial to the Defendant.

(2) That the Court erred in failing to grant the motion to dismiss the indictment.

(3) That the Court erred in denying Defendant's motion for Bill of Particulars.

(4) That the Court erred in failing to grant the Defendant's motion for a mistrial.

Ronald E. Ayotte, County Atty., Alfred, Peter T. Dawson, Asst. Atty. Gen., Augusta, for plaintiff.

(5) That the Court erred in failing to grant a motion or acquittal.

(6) That the Court erred in failing to grant Defendant's motion for a new trial.

(7) That the Defendant failed to receive a fair trial under the Due Process Clause of the Constitution of the United States and of the State of Maine."

The indictment is as follows:

"THE GRAND JURY CHARGES: that Lucien Therrien of Biddeford, County of York, State of Maine, Arnold Goldman of Kennebunk, County of York, State of Maine, and Theresa Martelle of Portland, County of Cumberland, State of Maine, and divers other persons whose names to the said grand jurors are unknown, on April 5, 1965 and continuously thereafter up to and including October 18, 1967, at Biddeford, County of York, State of Maine, and other divers places in the County of York, State of Maine, said places to your grand jurors unknown, did combine, conspire and agree together, feloniously with malicious intent, wrongfully and wickedly, to commit a crime punishable by imprisonment in the State Prison to wit: did then and there illegally conspire and agree together with such intent, wrongfully and wickedly to engage in bookmaking unauthorized by law in violation of Title 17 M.R.S.A. Section 1801, to wit: illegally making, accepting and otherwise participating in wagers on horse races, sporting events and number combination games."

*Motion to Dismiss the Indictment*

We first consider the Defendant's motion to dismiss the indictment. In order to do this it is necessary to have in mind the Maine Statute relating to conspiracy and bookmaking. Conspiracy is proscribed by 17 M.R.S.A. § 951, the essential parts thereof relating to the issues here are as follows:

"If 2 or more persons conspire and agree together, with the fraudulent or malicious intent wrongfully and wickedly * * * to commit a crime punishable by imprisonment in the State Prison, they are guilty of a conspiracy."

17 M.R.S.A. § 1801 prohibits bookmaking in this language:

"Whoever engages or participates in pool selling, bookmaking and numbers game, or aids or abets the same by his presence unless the same is authorized by law, * * * shall be punished. * * *"

The punishment following conviction for bookmaking permits imprisonment in the Maine State Prison and is, therefore, a felony, which term "includes every offense punishable by imprisonment in the State Prison." 15 M.R.S.A. § 451.

The Defendant advances the theory that this indictment goes no further than charging the Defendant with placing a bet with a bookmaker, which could not result in a conspiracy because bookmaking itself requires the concerted action of at least two participants. We do not agree with this contention. To paraphrase State v. Pooler (1945), 141 Me. 274, 43 A.2d 353 (which dealt with a conspiracy to maintain and operate a lottery), the bookmaking statute is directed against persons acting individually; whereas, the conspiracy statute is designed to provide punishment for a combination of persons acting in concert to accomplish an illegal object. This indictment does not charge the Defendant with being merely a bettor, but does sufficiently charge the Defendant and two others with conspiring to gain an illegal objective; namely, bookmaking. Hurwitz v. State (1952), 200 Md. 578, 92 A.2d 575. See also McGuire v. State (1952), 200 Md. 601, 92 A.2d 582.

We hold under the familiar rule stated in State v. Charette, (1963) 159 Me. 124, 188 A.2d 898, that this indictment suffi-

ciently charges a criminal offense. It complies with M.R.Crim.P. Rule 7(c).

*Denial of Motion for a Bill of Particulars*

■ Prior to trial the Defendant filed a "Motion for a Bill of Particulars" in which he moved that the State be ordered "to file a Bill of Particulars stating the matters to be given in *evidence* against the Defendant." (Emphasis added.) We assume that this motion was filed pursuant to M.R.Crim.P. Rule 7(f).[1] The motion was denied over the Defendant's objection. The record discloses a "Motion for Discovery" which contains sixteen requested items, many of which could be evidentiary in nature. The Motion for Discovery was granted on February 20, 1968, and there is no evidence that the State failed to conform faithfully to the order allowing discovery. In ruling on the Motion for a Bill of Particulars the Presiding Justice, having this background in mind, decided that there was no occasion to grant the motion. In fact, the record discloses that Defense Counsel was asked if there had been a compliance with the Order for Discovery and he responded, "As far as I know, it has been complied with." In the commentary under this rule (§ 7.14) Professor Glassman states:

"It is not the function of a Bill of Particulars to disclose in detail the evidence upon which the prosecution will rely, * * *.

The grant or denial of a Motion for a Bill of Particulars is a matter which rests within the discretion of the trial court and the trial court's ruling will not be disturbed in the absence of an abuse of discretion. * * *"

The record before us discloses no abuse of discretion.

*Motions for Acquittal and New Trial*

The State relied principally on the testimony of Lucien Therrien, who was an admitted bookmaker. His base of operation was known as the "Cue Stick Lounge" in Biddeford, and he booked bets on horse races, sporting events, card games and numbers games. Mr. Therrien described his relationship with the Defendant between the dates alleged in the indictment. It was apparent that the Defendant began this association by placing small bets from time to time with Mr. Therrien. They ultimately expanded their association to a point when Mr. Therrien began to "lay off" some of his larger bets with the Defendant. In describing this, Mr. Therrien used such words as these:

"Well, larger bets, I would give him what I couldn't handle, myself."

\* \* \* \* \* \*

"Well, every day that I would call him, I would tell him I would stay with so much and let him take care of the rest."

Mr. Goldman, on the other hand, denied this arrangement and said that his only relationship with Mr. Therrien was that of betting with the bookmaker and that he never engaged in the so-called "lay off" procedure.

On October 18, 1967, the Maine State Police conducted a gambling raid on the "Cue Stick Lounge" and placed Mr. Therrien under arrest. During the progress of the raid one Adrien Boudreau entered this building, having in his possession a brown manila envelope which was taken by the Police and was found to contain $4,083.00. According to Mr. Therrien, he had given Boudreau $5.00 to go to the Defendant's place of business, get this envelope and bring it to him. The money therein contained, Therrien said, was the "lay off" assumed by the Defendant and required to pay losses he had incurred booking bets on the 1967 World Series. The record discloses these questions and answers:

"Q (By Mr. Lilley) Why did you send for the money?

---

1. "The court *for cause* may direct the filing of a bill of particulars. \* \* \*" (Emphasis added.)

A To pay the players that had placed bets.

Q I see. Were—did you cover bets of this size?

A I couldn't. No.

Q You couldn't pay bets of this size?

A No, I did not have no money to cover bets of that size.

Q So this money was to pay bets of this size from Arnold Goldman?

A Yes."

Mr. Goldman subsequently testified that he did, in fact, deliver the envelope to Mr. Boudreau but he was simply doing this as a favor for a "bookie" in the Boston area known as "Blinkie." He denied in this connection that he acted as a "lay off" man for Mr. Therrien's World Series bets.

The State also introduced other evidence descriptive of the betting activities in the "Cue Stick Lounge." They produced as exhibits certain records taken from Mr. Therrien and the analysis of these records by an expert, which indicated that Mr. Therrien in the first nine months of 1967 booked approximately $180,000.00 in various types of bets, of which sporting events composed in excess of $88,000.00. They introduced evidence of a delivery of money in the Boston area to a person known as "Beachie" and there was evidence from two truck drivers of the delivery of unidentified envelopes at the Defendant's request, particularly to one Edgar Morin. Among the exhibits taken from Mr. Therrien at the time of the raid was a book in which the names "Beachie," "Edgar Morin" and "Arnold" appear and the State's expert expressed the opinion that this exhibit recorded the bookmaking activity of Mr. Therrien.

█ It is our obligation when ruling on the motions for acquittal and for a new trial to determine from the facts whether there was believable evidence from which the Jury could say beyond a reasonable doubt that the Defendant was guilty. State v. Arsenault, (1956) 152 Me. 121, 127, 124 A.2d 741. As we see it, the Jury could believe the testimony of Mr. Therrien and reject the testimony of Mr. Goldman. If they accepted the testimony of Mr. Therrien, they were justified in concluding that Mr. Goldman acted as a "lay off" man. So viewed, the verdict of guilty was justified. It is clear to us that the Jury could have concluded that this is not a case in which Mr. Goldman merely placed bets with Mr. Therrien, and either won or lost. The facts support the conclusion that Mr. Therrien and Mr. Goldman had come to an understanding by which Mr. Therrien would obtain bets on horse races and sporting events from among his gambling clientele and book these bets with the agreement that Mr. Goldman would pay off those losses which he had previously promised to assume or, if there were no losses, to accept the winnings on his share of the bets thus booked. The Jury could have concluded that Mr. Therrien would have been unable to carry on his bookmaking activities at the financial level which the facts disclose without the backing of Mr. Goldman. Mr. Therrien's testimony concerning the amount of money he handled on the 1967 World Series, accompanied by the delivery of $4,083.00 to him on the day of the raid is credible evidence in support of this conclusion. We find no error in the ruling of the Justice below on these motions.

### Motion for Mistrial

During the course of the trial the State offered Adrien Boudreau as a witness. Mr. Boudreau was the messenger sent by Mr. Therrien to the Defendant for the envelope which contained $4,083.00, and which was seized by the police at the Cue Stick Lounge during the raid of October 18, 1967. The record discloses the fol-

lowing interrogation, *all without objection by the Defendant*:

"ADRIEN BOUDREAU having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. LILLEY:

Q  Mr. Boudreau, do you know Arnold Goldman?

A  I respectfully refuse to answer on the grounds it might tend to incriminate myself."

Then followed fifteen questions and answers dealing with Mr. Boudreau's residence, employment and familiarity with the Cue Stick Lounge. The concluding questions are these:

"Q  On Alfred Street. Have you ever been in the Cue Stick Lounge?

A  I refuse to answer under the grounds it might tend to incriminate myself.

Q  Do you know Lucien Therrien?

A  I refuse to answer under the grounds it might tend to incriminate myself.

Q  Are you familiar with the Arlen Box Company in Kennebunk?

A  I refuse to answer under the grounds it might tend to incriminate myself."

The Jury was then excused and an attorney for Mr. Boudreau, being present, stated, "[I] feel that the witness is perfectly justified in his refusal to answer these questions." After an extended recess the witness was excused and Defendant's Counsel moved for a mistrial. The record discloses his reasons as follows:

"[T]he State's Attorney knew before he brought the witness to the stand that the witness was going . . . to plead his immunity."

\*     \*     \*     \*     \*     \*

"So that there was no need to put the witness on to get that particular evidence, whatsoever.

"Now, the purpose of putting that witness on was that the State's Attorney knew he was going to plead the Fifth Amendment. He knew he was going to do it in front of the jury, and it was to create a sinister effect upon this jury, deliberately done, may it please this Court. And I say it reacts to the prejudice of this Defendant, because it makes it appear that somehow or other this is a whole sinister plot, a whole sinister act. And that this Defendant somehow is connected with this type of thing, and it can only have that type of effect upon the jury, and no other type of effect, whatsoever."

The Presiding Justice then listened to extensive statements by both Counsel and recorded his understanding that even Mr. Boudreau's attorney did not know whether immunity would be claimed by the witness until he actually did so. The Justice accepted "in complete good faith" the Prosecutor's statement, "We don't know, and we didn't know what he was going to say," and overruled the motion. Immediately following the ruling the Jury was seated and this admonition was given them:

"THE COURT: Mr. Foreman and Ladies and Gentlemen of the Jury, you have just heard a witness testify in court and claim the privilege against self-incrimination under the Fifth Amendment. This is a right guaranteed to any witness under the Constitution. Nor is he required to disclose why he claims this privilege, except that his claim is sincere and he has a reasonable apprehension. The witness has not even been pressed this far. But I advise you as a matter of law that you are to draw no factual inferences against the defendant here on trial because of this exercise of a constitutional right on the part of a witness. You are to draw no inferences against the Defendant from this, whatever. It

is a privilege personal to the witness and into which—into the motives for which the Court can make only the most limited inquiry. I don't know, nor am I entitled to know what the witness is desiring to protect himself against. But it is not imputable and does not impute crime to any other person. And it is not evidence which you are entitled to consider or to weigh in your ultimate evaluation in this case, and this is by constitutional right. Do you so understand it? Do you feel that you can so abide it and accept it in this fashion?"

No objection was noted to this instruction.

The Defendant cites only one case, Robbins v. Small, (1 Cir. 1967) 371 F.2d 793, in support of his position. This decision hinged on whether the prosecutor's conduct in the interrogation of a witness at the trial deprived *Small* of his Sixth Amendment rights; namely, his right of confrontation and cross-examination. As the Court put it: "The prosecutor, through these repeated questions, indirectly but effectively brought to the jury's attention the *substance of a statement that was not in evidence* and, therefore, not subject to cross-examination." (Emphasis added.) In *Robbins* from a statement read by the Prosecutor to a witness fourteen questions were posed which, if answered affirmatively, related to fundamental issues and could be crucial to the proof of the State's case. As we view the record before us, no Sixth Amendment issues are involved, the evidence sought to be obtained being only corroborative in nature to that which was already in the record; namely, Mr. Therrien's testimony that he sent Mr. Boudreau to the Arlene Box Company office to get an envelope from Mr. Goldman and bring it back to the Cue Stock Lounge for delivery to him.

Having thus distinguished *Robbins* from the present case, we note the following language found in Namet v. United States

(1963), 373 U.S. 179, 83 S.Ct. 1151, 10 L. Ed.2d 278:

"[I]t is said that when a witness is asked whether he participated in criminal activity with the defendant, a refusal to answer based on the privilege against self-incrimination tends to imply to the jury that a truthful answer would be in the affirmative. This inference, the petitioner argues, cannot properly be used as evidence against a criminal defendant. * * *

None of the several decisions dealing with this question suggests that reversible error is invariably committed whenever a witness claims his privilege not to answer. Rather, the lower courts have looked to the surrounding circumstances in each case, focusing primarily on two factors, each of which suggests a distinct ground of error. First, some courts have indicated that error may be based upon a concept of *prosecutorial misconduct*, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. * * * (Emphasis added.)

A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added *critical weight* to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant. * * * And even when the objectionable inferences might have been found prejudicial, it has been held that instructions to the jury to disregard them sufficiently cured the error." (Emphasis added.)

■ The Justice below did not find any "prosecutorial misconduct" in the examination of Mr. Boudreau and there is nothing in the record demonstrating such finding to be clearly erroneous. Our review of the record does not indicate that Mr. Boudreau's refusal to answer the four questions added "critical weight" to the State's case.

Even if we assume some prejudice might have resulted from the exercise of immunity by the witness, the quoted instruction to disregard the evidence was curative. We recently restated the long established rule in Maine that "[A] motion for a mistrial is addressed to the discretion of the Presiding Justice who, being in contact with the trial conditions and circumstances, is peculiarly qualified to render a decision. Such a ruling will not be disturbed in the absence of a clear abuse of discretion. * * *" State v. Hachey (Me. June 8, 1971), 278 A.2d 397. See also State v. Woods (1958), 154 Me. 102, 144 A.2d 259. The instruction here given, measured by the approved statement of the Justice to the Jury in *Hachey*, supra, was accurate, complete and fair. We conclude that the Justice below was correct in his refusal to grant the motion for a mistrial.

*Motion to Strike Testimony*

The State called two witnesses, Paul E. Lessard and Charles Williams, both of whom testified that they were truck drivers employed by the Defendant's firm. Mr. Lessard said he had been directed by the Defendant "two or three times" to deliver sealed envelopes with a "criss-cross" partly on the flap and partly on the envelope" to Mr. Therrien at the Cue Stick Lounge. There was no writing on any of the envelopes, nor had he ever made a return delivery of envelopes from Mr. Therrien to the Defendant. He testified that he had done a similar errand for the Defendant "once or twice to Edgar [Morin] in Sanford." Although his employment required the delivery of shoe boxes to various customers, he had never delivered such boxes to the Cue Stick Lounge.

Mr. Williams described his routine for delivery of shoe cartons to various customers of Arlen Box Company which involved either getting a signed receipt, or payment, for the orders. In addition, he testified to making "maybe 25" deliveries of sealed envelopes "just marked Edgar" to one Edgar Morin. He stated that he

had picked up one envelope from a fruit store in Biddeford at the direction of the Defendant and delivered it to him personally.

■ In considering the admissibility of this evidence, we must have in mind that the indictment charged a conspiracy to engage in bookmaking and we feel that the gambling proclivities of the persons involved are relevant to the issue. The circumstances described by these witnesses could allow the Jury to draw the inference that these envelopes contained either "pay off" or wagering money and might be considered as some corroboration of Mr. Therrien's previous testimony. We conclude the evidence was properly before the Jury.

" 'Necessity of Direct Evidence. * * * Conspiracies need not be established by direct evidence of the acts charged, but may and generally must be proved by a number of indefinite acts, conditions and circumstances which vary according to the purposes to be accomplished. The very existence of a conspiracy is generally a matter of inference deduced from certain acts of the persons accused, done in pursuance of an apparently criminal or unlawful purpose in common between them. The existence of the agreement or joint assent of the minds need not be proved directly. It may be inferred by the jury from other facts proved. It is not necessary to prove that the defendants came together and actually agreed in terms to have the unlawful purpose, and to pursue it by common means. If it be proved that the defendants pursued by their acts the same object, often by the same means, one performing one part and another another part of the same so as to complete it, with a view to the attainment of that same object, the jury will be justified in the conclusion that they were engaged in a conspiracy to effect that object. If, therefore, one concurs in a conspiracy, no proof of agreement to concur is necessary in order to make

him guilty. His participation in the conspiracy may be established without showing his name or giving his description.'

We cite this section in full, as every statement therein made is fully verified by decisions from a wide range of jurisdictions. In Commonwealth v. Smith, 163 Mass. 411, 40 N.E. 189, the court makes this statement: 'A conspiracy may be proved by circumstantial evidence, and this is the usual mode of proving it, since it is not often that direct evidence can be had. The acts of different persons who are shown to have known each other, or to have been in communication with each other, directed towards the accomplishment of the same object especially if by the same means or in the same manner, may be satisfactory proof of a conspiracy. * * * ' " State v. Trocchio (1922), 121 Me. 368, 376, 117 A. 460.[2]

### Denial of Right to Cross-Examine

█ In the *absence of the Jury* Mr. Therrien was examined to test his competency as a witness. He was interrogated both on direct and cross-examination as to his ability to recall relevant facts. Finally, after testifying that he was a patient in a State mental institution, he was asked, "Now, have you had any shock treatments since you have been there?" Defense Counsel, after objection and some colloquy, asked, "[I] am not going to be allowed to pursue that line of questioning before the Jury?"—and the Justice below responded:

"No. I think that should come from sources other than the witness. If he is as bad off as this line of inquiry would seem to indicate, why this can be demonstrated by evidence dehors this witness' testimony, and should be by competent medical testimony."

The record does not disclose any offer or proof nor any specific reason for asking the question objected to.

The Jury, through cross-examination of Mr. Therrien, was informed of facts bearing on the weight to be given his testimony including his confinement at the Augusta State Hospital, the fact that he required medication and was "on probation."

"Unsoundness of mind does not per se render a witness incompetent, the general rule being that a lunatic or weak-minded person is admissible as a witness if he has sufficient understanding to apprehend the obligation of an oath and is capable of giving a correct account of the matters which he has seen or heard with respect to the questions at issue. The decision as to the competency of such a person to testify rests largely within the discretion of the trial court." 97 C.J.S. Witnesses § 57b, at 446. See also Pease v. Burrowes, (1893) 86 Me. 153, 175, 29 A. 1053.

We find no abuse of discretion by the Presiding Justice in excluding the "line of questioning" having to do with shock treatments. We note that evidence of this type of therapy was not excluded in the ruling objected to, the Justice wisely suggesting that such testimony should be "by competent medical testimony." Such testimony was not offered.

### Denial of Motion for a New Trial

The Defendant's three grounds for this motion arise out of instructions to the Jury. The record clearly indicates that no objections were noted to any portion of the charge before the Jury retired although, at the request of Defense Counsel, the Justice did make one further explanatory statement to the Jury following his charge.

We have read the entire charge and find nothing therein either "highly prejudicial" or "well calculated to result in injustice." State v. Smith (1944), 140 Me. 255, 37 A. 2d 246; State v. Simpson (Me.1971), 276 A.2d 292.

---

2. Cited in Atlantic Reporter as State v. Vetrano.

The Justice below, during his charge, quoted from State v. Pooler, supra, a case which dealt with a conspiracy to maintain and operate a lottery. We see no basic distinction between a conspiracy to operate a lottery and one to engage in bookmaking and conclude that the Justice correctly used the words of *Pooler* as being analogous to the issues of the instant case.

The Defendant, secondly, has argued that a quoted phrase from the charge incorrectly stated the rule regarding the test to be applied to circumstantial evidence. We note that, before giving the statement claimed to be erroneous, the Justice defined circumstantial evidence and then said:

"So what must the circumstances be? Every circumstance which you consider must point to the inference of guilt of the defendant, and negatively tested must be inconsistent with any other reasonable hypothesis. And circumstantial evidence which fails to meet this simple test, fails of the necessary reliability for your use. And if when it is all analyzed, the circumstantial evidence has a reasonably, —*a reasonable hypothesis consistent with innocence, all of the circumstances are susceptible of a reasonable hypothesis consistent with innocence, the defendant is entitled to the benefit of that hypothesis, and a verdict accordingly.* And, of course, all of the facts which stand around the central fact to be inferred must exist as truth in your minds beyond a reasonable doubt." (Emphasis added to indicate the phrase now claimed to be erroneous.)

■ Viewed in its entirety, we see no error in this statement, nor could the Jury have been misled by it. We note that the Defendant was given an opportunity to request additional instructions which, in this connection, he did not utilize. We also note, *and with emphasis*, that M.R.Crim.P.

Rule 30(b) [3] was totally ignored by the Defendant.

The third alleged instructional error, *not objected to under M.R.Crim.P. Rule 30(b),* is said, in argument, to be so broad as to allow the Jury to find guilt premised on a finding that the Defendant merely indulged in betting with a bookmaker. This quotation is taken out of context of the whole charge which stated fully and completely the necessary elements of the crime of conspiracy.

The Justice below was entirely correct in his denial of the motion for a new trial.

### Motion for New Trial on Grounds of Newly Discovered Evidence

The only issue raised by this motion is whether the Justice was correct in denying the motion. The Defendant offered the testimony of a witness who testified that he had been in the York County Jail during a part of the time that Mr. Therrien was also in custody. This witness talked with Mr. Therrien about the Goldman case on several occasions while in the jail and quotes Mr. Therrien as saying, "He [Goldman] didn't have anything to do with it." This witness knew the Defendant's daughters and at some time subsequent to the trial he reported this conversation to one of them, with the result that it came to the attention of Mr. Goldman's attorney who interviewed him and obtained a statement from him.

The Justice who heard the motion was the same Justice who presided at the Defendant's trial. In his ruling on the motion he conceded that the evidence was newly discovered, that it was not discoverable in the exercise of reasonable diligence before the trial. He considered it to be "impeaching in character," "of doubtful credibility, and wholly conclusory in nature." That

---

3. "No party shall assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. * * *"

this testimony would have produced a different verdict was, in the mind of the Justice, "incredible" and he concluded that no useful purpose would be served by granting the motion and allowing another jury to hear the testimony.

██ The rule in Maine is well settled that a motion for a new trial on the grounds of newly discovered evidence will not be granted on evidence that is merely cumulative or impeaching unless it is clear that such impeachment would have resulted in a different verdict. Brine v. State, (Me. 1970) 264 A.2d 530. See also State v. Casale, (1952) 148 Me. 312, 92 A.2d 718. We agree with the conclusions of the Justice below and find no error in his ruling.

The decree is

Appeals denied.