**STATE of Maine**

**v.**

**Rodney WARREN and Alton Phinney.**

Supreme Judicial Court of Maine.

Dec. 3, 1973.

David M. Cox, County Atty., Bangor, for plaintiff.

Ranger, McTeague & Higbee, P.A., by Patrick McTeague, Brunswick, for defendants.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

ARCHIBALD, Justice.

The appellants, Rodney Warren and Alton Phinney, were secretly [1] indicted by a Penobscot County Grand Jury for conspiracy (17 M.R.S.A. § 951). Although separately indicted the cases were ordered to be tried together because the appellants could have been jointly indicted. Rule 13, M.R.Crim.P. The initial jury trial was in October, 1971 but a mistrial was ordered and the appellants were subsequently found guilty following a second jury trial in January of 1972. Each has appealed from the ensuing judgments. We sustain the appeals and order a new trial.

## FACTS

At the time of the alleged offense, appellants were officials of a meat cutters union embroiled in a long, bitter and well publicized labor dispute with a state wide chain of grocery supermarkets. The state's case against the appellants rested entirely on the testimony of one Frank Price. His recitation of certain conversations he had with both defendants and one Kevin Vick-

---

1. Although arrest warrants had issued against the appellants no preliminary, or "bind over" hearing had been held in the District Court prior to the return of the indictments.

ers comprised the state's case. Price, a newly appointed special deputy sheriff, had infiltrated the ranks of the striking labor union. He testified that on July 25, 1971, the appellants, along with Kevin Vickers, met with him in a specific Brewer motel room at which time and place it was agreed Price would plant a bomb in a Waterville supermarket affiliated with the state wide chain. Vickers, according to Price, undertook to procure dynamite and Price, for a fee of $50.00, was to manufacture, place and detonate the bomb, all with the acquiescence of both appellants.

Vickers, who was not indicted, although named in both indictments as a co-conspirator, was called by the state for the purpose of corroborating Price's testimony. Despite having been given complete immunity,[2] Vickers stood on his Fifth Amendment rights and, before the jury, refused to testify. He was ultimately found in contempt of court.

In their defense both appellants presented alibi witnesses explaining their whereabouts on July 25th, 1971. Motel records were introduced showing that neither Phinney nor Warren were registered at the particular motel on the day in question. In addition, both appellants testified and not only denied their part in any conspiracy but also denied that they were even in Brewer on the day in question.

In rebuttal the state offered a Penobscot County deputy sheriff who testified that, on July 25, 1971, while conducting a surveillance of the Brewer supermarket then being picketed, he observed the presence of Rodney Warren and Kevin Vickers.

Counsel for appellants attempted to impeach the testimony of Price with his army psychiatric records but the court, after an offer of proof outside the presence of the jury, ruled them inadmissible.

The principal issues raised as a basis for sustaining the appeal are these:[3]

1. Erroneous denial of motion to dismiss the indictments because of prejudicial pre-indictment publicity.

2. Failure to instruct the jury correctly concerning its function in dealing with the statements made by Kevin Vickers to Frank Price tending to inculpate the appellants.

3. Refusing to grant a motion for a mistrial because, in the presence of the jury, Kevin Vickers twice refused to answer a question on the ground of self-incrimination.

4. The refusal to admit army psychiatric records offered as a basis for expert defense testimony tending to impeach the testimony of Frank Price.

## ISSUE I

On September 17, 1971, a motion was filed demanding that the indictments be dismissed because prejudicial publicity generated by "agents of the state" prevented "the grand jurors from acting impartially on the question of indictment in this case." An evidentiary hearing was held on September 22, 1971 and the motion was denied. The record discloses the following colloquy:

"[Appellants' Counsel]: Your Honor, may it please the Court, at this time, on the same basis, I would move that the Court examine the Grand Jurors in camera regarding the effect of the publicity.

. . . . . .

My request, Your Honor, is that you examine the Grand Jurors who sat on the indictments involved here regarding their state of mind and impartiality regarding the individuals in the indictments and the circumstances and that

---

2. 15 M.R.S.A. § 1314–A.

3. Numerous other minor and incidental trial errors have been suggested. While we have given each consideration we deem it unneces-

sary to make further comment thereon except to indicate that they are either without merit, rendered moot in view of our decision ordering a new trial or waived because not argued on appeal.

you examine them generally for impartiality, and that you examine them in particular in regard to exposure to the particular issue of publicity in the media.

THE COURT: I recognize what you're quoting from under Rule 6, Annotation 3, I don't think your request is within the intendment of the rule no matter how far I stretch it. If you have any evidence you wish to offer, bearing on the lack of qualifications of any individual Grand Juror, or the state of mind of any Grand Juror, which prevented them from acting impartially, when that issue was raised, burden is on you to produce it and not me by questioning the Grand Jurors, as I understand the practice. Your motion is denied."

The rule in effect on the date of the hearing was in this language:

"If not previously determined upon challenge, a motion to dismiss the indictment may be based on objections to the array or on the lack of legal qualifications of an individual juror or *on the ground that a state of mind existed on his part which prevented him from acting impartially . . .* " (Emphasis supplied.) Rule 6(b)(2) M.R.Crim.P.[4]

The evidentiary hearing consisted of the testimony of the Penobscot County Sheriff and the introduction of nine exhibits, consisting of newspaper, radio and television accounts which were circulated in Penobscot County at the time of the labor dispute in July and August, 1971. Included were two publicized interviews with the Sheriff, one on radio and the other on television.

A careful reading of these exhibits discloses that, with two exceptions, the reported releases were general in nature revealing that an investigation was in progress, that arrests had been made with the

names of the persons arrested. They reflected facts as disclosed in the public record and could be characterized as objective reporting.

In two instances, we note less objectivity.

One issue of a Sunday paper published on August 8, 1971 carried a story which went beyond factual reporting suggesting details of the alleged conspiracy and elaborating on the role played by Mr. Price as an undercover agent.

The other instance was the report in a daily newspaper of an interview with the Sheriff which contained the following quotation:

"It's *too* damn bad that gangsters can come into Bangor and make bombs to put in markets and be more worried about their own heads. . . . [They] didn't care if they killed a child in the process of blowing up a grocery store. . . ."

The record is not clear whether this story was in the issue of July 16, 1971, or August 6, 1971, but the quoted excerpt appeared on an inside page and was published only once.

With the exception of one article which was published after the indictments were returned, all the exhibits appeared at least one month prior to the impanelment of the grand jury.

Since the appellants' counsel correctly assumed that the testimony of the Sheriff conjoined with the exhibits was an insufficient basis for granting the initial motion,[5] it is not necessary for us to discuss what type of pre-indictment publicity, *if any,* could be the basis *as a matter of law* for the dismissal of an indictment. Rather, the issue becomes whether, in view of the evidence, the Justice below abused his dis-

---

4. This rule was amended effective September 23, 1971, but such amendment retained the language above emphasized.

5. Counsel stated: "I would not ask the court to grant my motion at this time, because I don't think there is enough before the Court at this time."

cretion in not allowing the individual grand jurors to be subpoenaed for the purpose of a post-indictment voir dire examination.[6]

Since Rule 6(b)(2) was drafted on the assumption that an indictment is subject to dismissal if a state of mind exists in sufficient members of the grand jury to render less than twelve of them incapable of "acting impartially", we must consider (1) whether pre-indictment publicity may properly be considered as having the *potential* to do so and (2), if so, that the scope and nature of such publicity must be in order to justify a voir dire of the grand jurors who participated in returning an indictment.

 It would seem self-evident that a criminal defendant is entitled to an impartial jury, whether it be grand or traverse. We would be less than realistic if we did not recognize the inherent capacity of the media, in the exercise of their constitutional freedoms, to give wide coverage to newsworthy events. Public opinion undoubtedly is influenced by what is thus read, heard or seen. However, awareness of public happenings via the media does not necessarily result in the creation of a generalized public state of mind which prevents impartial consideration. It is only when certain excesses are indulged in that the potential for bias and prejudice become manifest. In such cases, voir dire of jurors becomes essential in the interest of justice. The existence of such an exigency and the scope of examination lies in the sound discretion of the trial judge. *See,* State v. Pritchett, 302 A.2d 101, 107 (Me. 1973).

Under what circumstances does the exercise of judicial discretion mandate such a voir dire?

 Consideration must be given both the quantity and quality of the publicity.

Such questions as these might be asked: was the news coverage both intensive and extensive? Were the reports written, or otherwise presented to the public, in such a manner as to invidiously arouse in the public mind a sense of ill will or vindictiveness? Would the reception of such information from the media inflame the emotions? Or, on the contrary, were the reportings factual and straightforward news stories? We have not attempted to limit the items which a presiding justice may consider in determining whether to allow a voir dire of grand jurors under Rule 6(b)(2) but, rather, to suggest appropriate areas of consideration. Illustrative of cases where indictments have been challenged because of pre-indictment publicity are Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); Estes v. United States, 335 F.2d 609 (5th Cir. 1964); Madison v. State, 256 Ind. 353, 269 N.E.2d 164 (1971) and United States v. Sweig, 316 F. Supp. 1148 (S.D.N.Y.1970).

 Throughout all the cases is the holding that, despite the type of publicity involved, the movant must demonstrate that he has been prejudiced thereby. State v. Hale, 157 Me. 361, 172 A.2d 631 (1961). *See also,* State v. Coty, 229 A.2d 205 (Me. 1967).

Although *Hale* was involved with an alleged abuse of judicial discretion in denying a motion for change of venue, we feel the rule there stated is equally applicable to a motion to dismiss an indictment. *Hale* precludes any conclusive presumption of prejudice, however unfortunately worded the published articles may be, and requires that actual prejudice be shown. The presence, or absence, thereof rests in the sound discretion of the presiding justice.

 To initiate a possible invasion of the traditional secrecy and independence of

6. We prefer to consider the oral motion in its broadest sense and not to limit its scope by construing the language strictly as being merely a request that the Justice personally call in the grand jurors for examination, as opposed to a general request to conduct a voir dire examination of the jurors.

a grand jury by allowing a post-indictment voir dire requires a preliminary showing that the pre-indictment publicity was of such a potentially prejudicial nature and character that reasonable people exposed to it would tend to be rendered incapable of exercising an impartial judgment. This preliminary finding lies with the presiding justice.

■ Applying these rules to the publicity before us, and bearing in mind that we must assume (because there is no indication in the record otherwise) that the grand jury was properly instructed and sworn to "present no man for envy, hatred or malice", we do not believe that either the quantity or quality of the media coverage reflected in the record before us would justify granting the request for a voir dire of the grand jurors. The Justice below exercised his discretion properly.

## ISSUE II

During the testimony of Price he repeated two conversations with Vickers. On July 26th Price quotes Vickers as follows:

"Mr. Vickers told me that he was having trouble getting the dynamite and cap for me to use, but that the job was still on."

On the following evening Price testified he again talked with Vickers, whom he quotes as saying:

"He told me that he was still having trouble getting the dynamite and materials for me to use, but that it was still on. We just had to push it ahead. It was still on."

Although appellants did not comply with Rule 30(b), M.R.Crim.P. by seasonably filing a request for instructions dealing specifically with this evidence, they did comply with this rule as it relates to the assignment of alleged error arising from the omission to charge thereon. Following the charge, and before the jury retired, defense counsel stated:

"I ask that the jury be Charged, your Honor, that unless they [sic] find a conspiracy exists, and in particular, unless they find that conspiracy exists and a certain speaker is a member of that conspiracy, then words said by him may not be used against the other Defendant."

The request was denied.

Appellants contend that the statements of Vickers, as repeated by Price, could be considered by the jury as tending to inculpate them only if, preliminarily, the *jury* determines beyond a reasonable doubt that a conspiracy in fact existed.

■■ The position taken by defendants recognizes the well established rule that allows the statements of one conspirator made to a third party to be used at the trial of a co-conspirator. The preliminary question of whether the existence of the conspiracy has been established and upon which the reception of this type of testimony must depend is the function of the presiding justice, not that of the jury. The rule is succinctly stated in Parker v. State, *276 So.2d 98, 99 (Fla.App.1973)*, namely:

"Under an exception to the hearsay rule, extrajudicial declarations of one conspirator made outside the presence of a co-conspirator may be admitted in evidence against the latter where the declaration was made in furtherance and during the existence of the conspiracy. Before such declarations may be admitted, however, the existence of the conspiracy and the defendant's participation therein must be established on a prima facie basis by other evidence which is admissible without reference to the aforementioned exception. . . . A determination as to whether or not a prima facie case has been established as a predicate for the admission of co-conspiratorial declarations and acts is a question for the trial judge to determine—not the jury. . . . Orderly procedure demands

that normally such predicate be established before not after the acts and declarations of co-conspirators are introduced."

The fallacy of adopting the rule advocated by the appellants is pointed out in Carbo v. United States, 314 F.2d 718, 736 (9th Cir. 1963) where that court stated:

" . . . Appellants' view of the law, as set forth in the proposed instructions, is that the preliminary question is to be resolved by the jury upon proof beyond a reasonable doubt.

Yet if by independent evidence the defendant's position as co-conspirator is to be established by the jury upon their judgment beyond a reasonable doubt, there is no occasion ever to resort to the declarations at all. The district court in effect will have told the jury, "You may not consider this evidence unless you first find the defendant guilty. . . ."

This rule was strongly supported in United States v. Dennis, 183 F.2d 201, 231 (2nd Cir. 1950) in this language:

" . . . [W]e think that the better doctrine is that the judge is always to decide, as concededly he generally must, any issues of fact on which the competence of evidence depends, and that, if he decides it to be competent, he is to leave it to the jury to use like any other evidence, without instructing them to consider it as proof only after they too have decided a preliminary issue which alone makes it competent."

█ The adoption of this rule is merely a further application of the position recently taken by our court in deciding that it is the exclusive function of the presiding justice to determine essential questions of admissibility. State v. Collins, 297 A.2d 620 (Me.1972); State v. Kelley, 308 A.2d 877 (Me.1973); State v. Lafferty, 309 A. 2d 647 (Me.1973).

There is no merit to the appellants' claim of error on this issue.

## ISSUE III

The appellants generate this issue by the denial of their motion for a mistrial. Vickers twice, both times in the presence of the jury, refused to answer a single question on grounds of self-incrimination. Since this ruling is attacked as an abuse of discretion because of the alleged prejudice resulting therefrom, we must view it in proper factual context.

Appellants, originally, went to trial in October, 1971, which resulted in a mistrial. However, during that proceeding Vickers, although granted full transactional immunity, (15 M.R.S.A. § 1314–A) refused to testify and was sentenced to pay a fine of five hundred ($500.00) dollars for contempt, which he paid. At the second trial in January, 1972 Vickers persisted in his refusal and was again found guilty of contempt and sentenced therefor.[7] It is upon the attendant circumstances of these second refusals that the motion is predicated.

Before Vickers was called as a witness, Price had described the events of July 25th in the motel room depicting Vickers as an active participant in formulating the details of the conspiracy. He had also testified concerning his two conversations with Vickers not in the presence of either appellant. Thus, the jury was free to weigh Price's reiteration of *Vickers'* activities and statements in determining whether *Warren* and *Phinney* entered into a conspiracy at the July 25th meeting in the Brewer motel. In short, the jury could infer from Price's testimony that Vickers' conspiratorial activities were co-equal with those of the appellants.

We must thus recognize that the entire strength of the state's case rested on the testimony of Price. Otherwise stated, without his testimony the record does not contain even a scintilla of evidence which

7. State v. Vickers, 309 A.2d 324 (Me.1973).

would support the convictions. On all facts essential to proof of guilt, the jury was required to accept the testimony of Price and completely reject that of the appellants and their witnesses.

After denial of a motion to examine Vickers in the absence of the jury,[8] Vickers was sworn, before the jury, as a witness. He identified himself to the jury, acknowledging acquaintance with the appellants and admitting he had picketed for the union. He was then asked:

"Q. Is that the only *activity* you engaged in for this local?

A. I refuse to answer the questions on the grounds they might incriminate me." (Emphasis supplied.)

The jury was then excused and the presiding justice explained to Vickers (who was represented by counsel) the continuing viability and scope of the immunity, warned him that another refusal to testify could result in punishment by imprisonment, and stated: "I am now ordering you to testify when the question is put to you and the jury returns."

On the return of the jury, the record discloses the following:

"The Court: All right, Mr. County Attorney, you may return the witness to the stand.

Take the stand, Mr. Vickers. Do you want the pending question read, Mr. County Attorney?

[County Attorney]: Yes, your Honor.

The Court: Will you read the question, Mr. Rand?

(Reporter reads the pending question.)

The Court: All right, Mr. Vickers, you will now answer the last question.

A. I refuse to answer the question on the grounds it may incriminate me.

The Court: All right, the jury will be excused, and you might as well go upstairs again. I am sorry to do this to you."

Appellants' counsel immediately moved for a mistrial and was denied. The state then rested. Thus, the only evidence the state presented to the jury in establishing proof of the alleged crime was Price's description of the conspiracy and Vickers' refusal to testify on the grounds of self-incrimination.

The jury was not immediately instructed to disregard the fact that Vickers had refused to testify but, during final instructions, it was told to "put that out of your minds completely."

 The question becomes: Were the *two* refusals of Vickers to answer the

8. [Defense Counsel]: The Defense understands that the Prosecution intends to call immediately after this recess Kevin Vickers as a witness for the State. Kevin Vickers was called in the hearing of this cause last summer, was granted immunity, and refused to testify, as the record will so show. I do not know with mathematical certainty whether he will testify or not today. I do know that he did refuse to testify last summer.

The Reporter: Fall.

[Defense Counsel]: And I would ask for a number of things, number one, that the Court, recognizing it would not constitute contempt, that the Court would reserve the problem or increase the degree of certainty that we have in one direction or another by talking to Vickers out of the presence of the jury with his counsel present, and seeing if he presently intends to testify or not.

If the Court declines to do that, then I would ask the Court that his entire time on the stand be out of the presence of the jury, because this is a case where apparently the State has only one witness, aside from Mr. Vickers, and the question of the effect on the jury's mind of calling him and having him refuse to testify would be most prejudicial to the Defendants.

An additional reason for the Motion is, we consider that there is no heavy burden on the State or anyone else in following the procedure we suggest, a matter of a short time followed. Whereas, if the other procedure is followed, it creates a distinct likelihood of prejudicing the jury.

The Court: Motion denied."

question on grounds of self-incrimination *in the presence of the jury* so prejudicial that a mistrial should have been granted? We believe so.

The recent case of State v. Goldman, 281 A.2d 8 (Me.1971) speaks directly to this issue. In *Goldman*, as here, the defendant moved for a mistrial because a witness was allowed to exercise his constitutional right against self-incrimination before the jury. The *Goldman* court adopted as a standard Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963):

". . . None of the several decisions dealing with this question suggests that reversible error is invariably committed whenever a witness claims his privilege not to answer. Rather, the lower courts have looked to the surrounding circumstances in each case, focusing primarily on two factors, each of which suggests a distinct ground of error. First, some courts have indicated that error may be based upon a concept of *prosecutorial misconduct,* when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. . . . (Emphasis added.)

A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added *critical weight* to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant. \* \* And even when the objectionable inferences might have been found prejudicial, it has been held that instructions to the jury to disregard them sufficiently cured the error." (Emphasis added.) 181 A. 2d at 14.

In *Goldman,* because no prosecutorial misconduct was manifest, because the testimony sought to be elicited was not critical to proof of the state's case and because appropriate instructions to disregard were immediately given the jury, we found no error in refusing to grant the motion for a mistrial. Such is not the case here.

We cannot escape the conclusion that Vickers' refusal to testify added critical weight to the state's case. Price had described the role that Vickers played in formulating the conspiratorial plans on July 25th in the Brewer motel. His later statements, as quoted by Price, that "the job was still on" and "we just had to push it ahead. It is still on," certainly were clear recognitions of the continuing viability of the scheme that Warren and Phinney had participated in originating. Relating to the precise question asked Vickers by the County Attorney,[9] the only "activity" involving the striking union that the jury knew about, outside of picketing, was the planned bombing of the Waterville store. Vickers' refusal to answer the question which suggested that he was involved in that "activity", on the ground that his answer "may tend to incriminate me" would clearly suggest to the jury that, if he answered truthfully, such answer would lead to an acknowledgement of the truthfulness of Price's testimony. Such an impression is not easily erased from the minds of jurors.

We recognize that this evidence need not have been presented to the jury. Had the motion been granted to hold a preliminary hearing in the absence of the jury the contemptuous refusal to answer could easily have been determined without creating any prejudice in the minds of the jury. We cannot say with any conviction that the jury would have reached its guilty verdict if it had not heard Vickers twice refuse to answer the question. In balancing the diametrically opposed testimony of Price and the appellants the jury may well have added an improper dimension of credibility to the evidence given by Price because Vickers' refusals, logically, supported it.

Finally, we consider whether the curative instruction could effectively erase the

---

9. "Is that the only *activity* you engaged in for this local?" (Emphasis supplied.)

prejudicial impact of Vickers' refusals to respond. Although speaking of the erroneous admission of prejudicial hearsay testimony, the language found in State of Maine v. Gagnon, 151 Me. 501, 504, 121 A.2d 345, 347 (1956) is dispositive:

"It is true that in his charge the Court instructed the jury to disregard evidence of the test. The presumption is that the jury abided the instruction but common sense dictates the conclusion that the damage had already been done. Our Court has ever been mindful of the constitutional rights of the accused to a fair and impartial trial. State v. Corey, 145 Me. 231, 74 A.2d 881. The evidence under the circumstances was of great impressiveness and was prejudicial to the respondent. We are not interested in the verdict, and have no thought of substituting our evaluation of the evidence for that of the jury. Our only interest is that which pertains to a fair trial."

It was error not to have granted the appellants' motion for a mistrial.

### ISSUE IV

Since this case must be remanded for a new trial, we consider it appropriate to discuss this final issue.

Mr. Price had been discharged from United States military service. The appellants in an effort to impeach this witness, offered as an exhibit his properly attested discharge records which included a psychiatric diagnosis. Because these records were completed more than a year prior to the trial, the justice below ruled them to be too *remote* to be admissible.

We wish to *stress* that our discussion of this issue is *specifically limited* to this ruling and should not be hereafter construed as touching upon any other objection that might go to the admissibility of the exhibit.

The record seems clear that the appellants' purpose in offering the exhibit was to lay a foundation for testimony by a defense psychiatric expert, who was prepared to testify that the condition noted in the discharge record would not have diminished or subsided. He would, in fact, have testified that such condition, in all probability, would have become accentuated resulting in possible hallucinations and fantasies by Price.

No citation of authority is needed to support the proposition that a criminal defendant has the right to introduce evidence tending to impeach the credibility of the prosecution's witnesses. This right becomes vital in a case, such as the one before us, where the state is relying on the uncorroborated testimony of a single witness. Unlike the facts in State v. Pullen, 266 A.2d 222 (Me.1970), appellants had supportive official documents and had made an offer of proof revealing the materiality of the proffered exhibit. While we acknowledge that the extent and scope of impeachment testimony lies within the limits of judicial discretion, if exercised without abuse, United States v. Cochran, 475 F.2d 1080 (8th Cir. 1973); Brooks v. State, 291 N.E.2d 559 (Ind.1973); State v. Lizotte, 249 A.2d 874 (Me.1969) discretion is considered abused, in a legal sense, if the ruling arises from a failure to apply principles of law applicable to a situation resulting in prejudice. Menge v. State Farm Mut. Auto Ins. Co., 41 Wis.2d 578, 164 N.W.2d 495 (1969).

The Justice below committed legal error when he premised his exclusion of the exhibit on *remoteness*, an element which bears primarily on weight and not on basic admissibility. We could not say, in view of the proffered testimony of the psychiatrist, that the exhibit had no value. State v. Satterfield, 114 Mont. 122, 132 P. 2d 372 (Mont.1943). The exhibit was an official government record disclosing a pre-existing mental condition recognizable by a qualified psychiatrist and which had a direct bearing on the capacity of the state's only witness to give factually accurate testimony on the date of the trial, even

though it was dated over a year prior thereto. Its weight was for the jury. People v. Blagg, 267 Cal.App.2d 598, 73 Cal.Rptr. 93 (1968).

Assuming a similar factual preliminary showing on a new trial, the exhibit is not inadmissible on the grounds of remoteness. It is not necessary for us to decide whether, independently of other error, this ruling would mandate a new trial.

## CONCLUSION

Because the appellants did not have the fair trial to which they are constitutionally entitled, the entry must be:

Appeals sustained. New trial ordered.

All Justices concurring.

WEBBER, J., sat at argument but retired before this opinion was adopted.